In re Anthony J. BORZILLO, Debtor.

Anthony J. BORZILLO, Plaintiff,

v.

Eileen BORZILLO, Defendant.

Bankruptcy No. 91–10874S.
Adv. No. 91–0381S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Aug. 1, 1991.

Kenneth Harrison, Philadelphia, Pa., for plaintiff-debtor.

Christine Shubert, Tabernacle, N.J., Trustee.

Jeffrey Meyers, Philadelphia, Pa., for defendant.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, Pa.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A.  INTRODUCTION

The instant proceeding to determine whether certain obligations undertaken by the Debtor-husband in a separation agreement with his ex-wife are nondischargeable as support and alimony to her under 11 U.S.C. § 523(a)(5), or are dischargeable as elements of a property settlement, obliges us to apply the principles set forth in *In re Gianakas*, 917 F.2d 759 (3d Cir.1990).  We conclude that, while *Gianakas* references "the language and substance of the agreement" as one of three indicators to be

considered in such a determination, a strong showing by the non-debtor spouse of the presence of the other two indicators—the parties' relative financial circumstances and the function served by the obligation at the time of the agreement—requires a conclusion of nondischargeability. Therefore, we hold that all of the obligations in issue, including the Debtor's liability to pay credit card debts in full which the agreement's language suggests is *not* in the nature of alimony or support, are nondischargeable under § 523(a)(5).

## B. FINDINGS OF FACT/PROCEDURAL HISTORY

1. The Debtor in the underlying bankruptcy case, ANTHONY J. BORZILLO ("the Husband"), filed a voluntary Chapter 7 bankruptcy case on February 15, 1991.

2. The instant adversary proceeding was commenced on May 30, 1991, by the Husband against his former wife, EILEEN BORZILLO, now known as EILEEN ZAPPALO ("the Wife"). In this proceeding, the Husband sought to have four of his obligations under a Separation Agreement between the parties approved by the Superior Court of New Jersey, Chancery Division, Gloucester County, Family Part, Docket No. FM–37223–89, on May 17, 1990, accompanying the parties' Divorce Degree ("the Agreement"), declared dischargeable; (1) Payments for two years on the mortgage securing the parties' former marital residence at 2 Halley Lane, Sewell, New Jersey, 08080 ("the Home"), conveyed to the Wife pursuant to the Agreement; (2) Maintenance of life insurance coverage of $100,000 on the Husband's life, under policies naming the parties' daughter Elaine (24 years of age at present) as Trustee and both the Wife and the parties' son Stephen (17 years of age at present) as beneficiaries in the amounts of $50,000 each; (3) Payment of $1,250 of the Wife's counsel fees in the divorce action, which totalled $9,500, same to be paid from proceeds of the contemplated sale of the Home; and (4) Credit

card indebtednesses which at that time totalled about $25,500.

3. The trial date of this proceeding, originally established on July 16, 1991, was continued, by consent, to July 23, 1991.

4. The parties, both physically healthy individuals who appeared younger than their apparent age in their mid–40s, were married on February 2, 1967. Their, separation, on January 6, 1989, was described by both parties as sudden, and appears to have possibly been precipitous, but it was nevertheless final. The Husband claimed that the Wife's incurrence of excessive credit card debts was the primary point of difference, and it is apparent that pressure caused by the Husband's declining income and increasing financial obligations was a factor in the separation. The Wife claimed that the Husband left for another woman, but presented no proof of details or identity of another woman, and the Husband denied any such involvement. The Wife was hurt by the Husband's departure and "has refused to speak to him since," making reconciliation impossible.

5. Although the Husband left the Home, he initially promised to indefinitely financially support the Wife and Stephen, who was at that time the only other resident of the Home.[1]

6. The Husband is the sole proprietor of a company which performs title searches and is also involved in a joint venture with another entity engaged in similar work.

7. Although only a high-school graduate, the Husband, obviously applying extraordinary business acumen, built his ventures up to the point where he earned over $90,000 in total income in 1987, and he had been earning comparable amounts in past years. However, due to a depression in the real-estate market thereafter, his earnings fell to about $60,000 in 1989 and to about $51,000 in 1990. When unified, the family lived "well," in upper middle class style.

---

1. Elaine and her husband subsequently also moved into the Home. This couple is childless, they both work, and they are now helping with household expenses. The Wife indicated, however, that she was somewhat disappointed with their willingness to make necessary financial contributions in the past.

8. At the time of the divorce, the Wife was unemployed. In 1975, she had attended and completed beautician school, but at trial she stated that she was unable to "handle" a job in that field after she graduated. She also worked briefly as a secretary. The Wife testified that the Husband greatly preferred that she not work in order to care for the Home and the children and to handle the home finances, while he ran his businesses. The Wife argued that this "traditional" labor division among the parties was attributable in part to the Italian South Philadelphia heritage of the parties, and this appears to be the case.

9. As he promised, the Husband remitted alimony, child support, payments for all household expenses, including the Home mortgage, utilities, credit cards, and living expenses, to the Wife from the time of the parties' separation through the finalization of the Agreement.

10. The parties were both represented by competent New Jersey domestic-relations law practitioners in their divorce action, who negotiated the Agreement at arms length on equal terms. The Wife's domestic-relations attorney was the only witness at trial in addition to the parties themselves.

11. The Agreement is subdivided into eleven "Articles." The first is an agreement to live apart. The second is entitled "Support and Maintenance." The terms of Article II include the Husband's promise to pay alimony of $100 per week to the Wife for two years; to pay child support of $210 per week for Stephen until he graduates from high school (which he did in 1991); and to re-evaluate his needs if he goes to college, which he is planning to do in the fall at a local community college; and (one of the matters in issue) to pay the mortgage and real estate taxes on the Home, which totalled approximately $600 monthly, for two years.

12. The third Article discusses custody of Stephen, which is to be in the Wife subject to "liberal" visitation for the Husband. In the fourth Article, the Husband is obligated to pay medical insurance and expenses for the Wife until December, 1992, and (the second matter in controversy) to "maintain" a $100,000 life insurance policy, naming Elaine as trustee and the Wife and Stephen as beneficiaries for $50,000 each.

13. In the fifth Article, the Wife was given sole title to the Home, which the parties' agreed was valued at $120,000 and subject to a $40,000 mortgage, and all but a few items of household furnishings. The Husband was entitled to retain an IRA valued at $10,000 and his business ventures, which were valued in a great range, i.e., between zero and $120,000. Such disparate valuations are apparently attributable to the fact that these businesses depend greatly upon the Husband's personal commitment to them and his particular abilities.

14. Article VI, addressing the crucial third matter in issue, recites in pertinent part as follows:

INDEBTEDNESS

(a) Annexed hereto and denominated as Exhibit "D–1" is a page from Plaintiff's Case Information Statement. Listed thereon are certain credit card creditors or "revolving charges" which total $25,499.00. The parties acknowledge that the total amount is higher at this time. Husband agrees to be solely obligated to pay all of these debts. Payment of this debt shall be considered to be in lieu of any further alimony payments and it is specifically acknowledged that the parties have agreed to this position, at least partially based on a determination as to the amount of alimony that is actually being paid to Wife by Husband pursuant to Article II, Paragraph 2. [The last sentence is crossed out on the original.]

15. The Wife's attorney testified that the obliterated language was proposed by the Husband's attorney, but was stricken by him to prevent adverse tax consequences to the Wife.

16. Eleven credit cards appear on the Information Statement. Three of the accounts which have outstanding balances,

those with Sears, CoreStates, and Pants Place, are in the Husband's name only. The Husband, with great animation, claimed that he was unaware of the very existence of the other eight cards which were solely in the Wife's name. He also testified that he was unaware of the balances on any of the cards, even those in his own name, until after the parties separated, and was greatly surprised to learn that the balances were so high.

17. The Wife testified that the credit card indebtednesses were all incurred before the parties' separation and that no charges had been added thereafter. Despite the rather large amount involved, neither party presented any documentary evidence, or anything other than vague generalities, to establish what items were purchased on these accounts. The Wife claimed that purchases included appliances, clothing, part of a family vacation, part of a down payment on the Husband's auto, a big-screen television which the Husband received in the Agreement, and jewelry.

18. The Husband recited no specific extravagances by the Wife. He acknowledged that the family lived well, "possibly too well," a circumstance which he attributed to the Wife and, as noted, he claimed that her overspending was the primary cause of the failure of the parties' marriage.

19. The next several Articles of the Agreement address mostly non-controversial topics, i.e., that each party is obligated to pay his or her own taxes, that the parties would be divorced, and their respective liabilities for counsel fees. As to the latter (the final issue in dispute), appearing in Article VIII, it is provided that each party is to pay their own counsel fees except that the Husband is to pay $1,250 to the Wife towards her counsel fees 60 days after the sale of the Home.

20. From May through November, 1990, the Husband adhered to the payment terms of the Agreement, ceasing only to pay utilities and other expenses no longer required under its terms. However, in November, 1990, apparently in contemplation of bankruptcy, the Husband ceased all payments except the support and alimony.

21. The Wife testified, without relating specifics, that several of the credit card holders had sued and obtained judgments against her, which are now liens against the Home. No mortgage foreclosure proceeding was mentioned, perhaps because contributions by Elaine and her husband or the stay of any action on the mortgage arising from this bankruptcy case have averted any such actions.[2]

22. The Wife's domestic-relations attorney provided the only testimony regarding the process of negotiation of the Agreement. Both attorneys apparently had a free rein, since the Husband stated that his main interest was in getting the process over quickly, and the Wife apparently did not become directly involved in negotiations.

23. The Wife's attorney stated that, under New Jersey law, the Wife had a strong "permanent alimony case," i.e., due to her weak individual financial condition and limited educational status, the Wife appeared to be entitled to alimony for the remainder of her life. However, the attorney stated that the Wife had agreed to reduce her permanent alimony claims to a term of five years in exchange for a clause in the Agreement allowing her to earn up to $15,000 per year before the Husband was entitled to seek a judicial review of her alimony benefits. The attorney further stated that final negotiations reduced the term of alimony payments to two years, while adding the Husband's liability to make the mortgage payments for two years and to assume the credit card debts. Thus, the attorney stated that he viewed the assumption of the mortgage payments and the credit card payments as financial trade-offs

---

**2.** Perusal of the Husband's schedules indicates that he did not list the mortgagee on the Home or any of the credit card holders as creditors. As he remains primarily liable on the mortgage and is secondarily liable for the credit card debts, it would appear prudent on his part to amend his Schedules to add such parties as creditors, under the procedure set forth in Local Bankruptcy Rule 1009.1(b).

for waiver of the Wife's strong permanent alimony claim.

## C. CONCLUSIONS OF LAW/DISCUSSION

### 1. THE ISSUE OF DISCHARGEABILITY OF INDEBTEDNESSES UNDER 11 U.S.C. § 523(a)(5) MUST BE DECIDED UNDER FEDERAL BANKRUPTCY LAW.

■ The Bankruptcy Code section controlling the disposition of this dispute is 11 U.S.C. § 523(a)(5), which provides as follows:

§ 523. Exceptions to discharge

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . . .

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with state or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

. . . . .

(B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support; ...

The issue of dischargeability of indebtednesses under 11 U.S.C. § 523(a)(5) must be decided under federal bankruptcy law, not state law. *See, e.g., Brown v. Felsen,* 442 U.S. 127, 138–39, 99 S.Ct. 2205, 2212–13, 60 L.Ed.2d 767 (1979); *Gianakas, supra,* 917 F.2d at 762; *In re Schmiel,* 94 B.R. 373, 380 n. 3 (Bankr.E.D.Pa.1988); and *Buccino v. Buccino,* 397 Pa.Super. 241, 248, 580 A.2d 13, 16–17 (1990) (state court has concurrent jurisdiction with the bankruptcy court to hear a § 523(a)(5) dispute, but the matter must be decided under federal bankruptcy law).

Any proceeding seeking a determination regarding dischargeability of a debt is a core proceeding. 28 U.S.C. § 157(b)(2)(I). Therefore, we are obliged to finally determine as well as hear the instant proceeding. 28 U.S.C. § 157(b)(1).

### 2. THE STANDARDS APPLICABLE TO § 523(a)(5) DISPUTES ESTABLISH THAT THE HUSBAND'S OBLIGATIONS TO MAKE THE MORTGAGE PAYMENTS, MAINTAIN PERSONAL LIFE INSURANCE, AND PAY A PORTION OF THE ATTORNEY'S FEES OF THE WIFE ARE NONDISCHARGEABLE.

*Gianakas, supra,* 917 F.2d at 762, it is established that

whether an obligation is in the nature of alimony, maintenance or support, as distinguished from a property settlement, depends on a finding as to the intent of the parties at the time of the settlement agreement....

Further, the court states that such

intent can best be found by examining three principal indicators....

First, the court must examine the language and substance of the agreement in the context of surrounding circumstances, using extrinsic evidence if necessary....

. . . . .

Because the language of the agreement alone may not provide a sufficiently conclusive answer as to the nature of an obligation, the second indicator to which we must look to assist in ascertaining the parties' interest is the parties' financial circumstances at the time of the settlement. The facts that one spouse had custody of minor children, was not employed, or was employed in a less remunerative position than the other spouse are aspects of the parties' financial circumstances at the time the obligation was fixed which shed light on the inquiry into the nature of the obligation as support....

. . . . .

Third, the court should examine the function served by the obligation at the time of the divorce or settlement. An obligation that serves to maintain daily necessities such as food, housing and transportation is indicative of a debt intended to be in the nature of support....

*Id.* at 762–63.

The court acknowledges, at *id.* at 762 n. 1, that the *Buccino* court recites the following fifteen factors, but it concludes that these factors "are merely elements" of its designated "three principal indicators:"

"the label given to the obligation in the underlying instrument; the express terms of the obligation; the form and placement of the debt in the original agreement or decree; whether the debt terminates on the occurrence of death, remarriage, etc.; the economic disparity between the parties; the length of the marriage; whether there are minor children in the care of the creditor spouse; whether the support award would have been adequate absent the liability in question; the intention of the court to provide support to the creditor spouse or children; the age, employability and educational levels of the parties; the language of the decree and the inferences which can be drawn therefrom; whether the creditor spouse suffered an economic disadvantage as a result of the marriage; whether the debts are payable directly to the former spouse; the circumstances leading to the dissolution of the marriage; and the financial resources, actual or potential, of each spouse." *Buccino,* [397] Pa.Super. at [254], 580 A.2d at 22.

■ The dischargeability of the Husband's obligation to make the mortgage payments for the following two years is the easiest issue to resolve. The first indicator referenced in *Gianakas* strongly suggests that this obligation is in the nature of alimony it appears in Article III of the Agreement, which relates specifically to Support and Maintenance. As the Wife was obviously an unemployed, dependent spouse at the time of the Agreement, the second indicator points in the same direction. Housing is obviously a necessity, and making

mortgage payments is a prerequisite for retention of a mortgaged residence; thus, the third indicator also points in the Wife's direction.

Comparing the instant facts relative to the mortgage-payment issue with the facts of *Gianakas,* we can easily conclude that the fact that mortgage payments are not made directly to the Wife, as is alimony and support, is not significant in the resolution of which such payments are in the nature of alimony or support. The *Gianakas* court stated that the majority position, which it adopted, "holds that a spouse's assumption of mortgage debts to remain in the marital residence is an obligation in the nature of support, maintenance, or alimony." 917 F.2d at 164.

What is presented here are facts which are very close to *Gianakas* relative to the second and third indicators, but which are tilted much more strongly towards the Wife as to the first indicator. Clearly, then, the Husband's obligation to make the mortgage payments is nondischargeable.

Regretfully, the Husband unilaterally ceased making the mortgage payments in November, 1990, even though they were to be of only a limited duration. Also, these payments were obviously critical to the maintenance of shelter, the most basic of necessities, to the Wife and Stephen. This action on the part of the Husband causes us to question his good faith intention to fulfill his obligations to the Wife which were nondischargeable.

■ The dischargeability of the Husband's obligation to "maintain" life insurance of $100,000 on his own life is only a slightly more difficult issue. Article IV, addressing the Debtor's life insurance purchase obligation, appears directly after Article III, addressing Support and Maintenance, suggesting a relationship between the two. The first indicator in favor of nondischargeability is therefore strong. As the Wife's status of a dependent spouse remains constant, the second indicator is again in the Wife's favor. The third indicator also points towards nondischargeability. It is absolutely necessary that some safety net be provided to support the Wife and

Stephen in the event of the Husband's death, as he is their sole means of support. *See In re Pollock,* 90 B.R. 747, 760–61 (Bankr.E.D.Pa.1988), and cases cited therein (obligations to maintain life insurance are generally viewed as non-dischargeable, on the basis of a variety of analyses).

The Husband testified that he believed that the requirement to maintain life insurance in the amount recited was in error, because he had only a policy in the amount of $10,000 in effect at the time of execution of the Agreement. While the Husband's assertion regarding the amount of insurance on his life in effect at the time of execution of the Agreement was undisputed, it is clear to us that the obligation to "maintain" life insurance provided for in the Agreement is not dependent upon the Husband's insurance coverage at the time that the Agreement was signed. Rather, the rather clear interpretation of this obligation which we would make is that, if the Husband had no such insurance, he was obliged to purchase same forthwith. His failure to do so constitutes a violation of the Agreement, thankfully rendered insignificant thus far in light of his continued good health. Thus, the Husband's unilateral conclusion that he need not comply with this requirement is yet another badge of his bad faith.

■ The dischargeability of the Husband's obligation to pay $1,250 of the Wife's counsel fees is a closer issue than the issue presented by the first two disputed obligations. The first indicator—the language of the Agreement—is at best ambiguous. Counsel fees are discussed in an Article of the Agreement separated from the Support and Maintenance and Insurance Articles by Articles which address, *inter alia,* equitable distribution of the parties' property. The second indicator—economic disparity of the parties—remains a constant factor in favor of the Wife. However, the third indicator is less in the Wife's favor than in the case of the mortgage payments and the insurance payments. Payment of a portion of the Wife's counsel fees does not provide her with such essential elements as shelter or a safety net.

However, we conclude that resolution of this issue is controlled by application of the reasoning set forth in our decision in *Schmiel, supra,* 94 B.R. at 379–81. Our conclusions in *Schmiel,* which favor the Wife, are underscored by the subsequent Wife-friendly analysis in *Gianakas.*

In *Schmiel,* we suggested that the burden upon a dependent spouse to establish nondischargeability of her counsel fees, in light of state laws which generally apportion such counsel fees between the spouses on the basis of financial need, is only a "scant" one. *Id.* at 379. We found, in *Schmiel,* that the apportionment of a liability to pay only a part of the counsel fees to the Husband is particularly indicative of an attempt to rely upon financial need in the allocation process. *Id.* at 380.

Moreover, the instant case is in an important sense an easier case on this point than *Schmiel.* In *Schmiel,* we were greatly troubled by what we believed were excessive legal expenditures by the wife, which persisted through the trial of the dischargeability case in our court. *Id.* at 380–81. By way of contrast, given the Wife's predicament, the lawyering on her behalf here and in state court appears restrained and appropriate, placing her and the Husband on an even playing field in this regard. We therefore conclude that the relatively modest obligation of the Husband to pay $1,250 of the Wife's counsel fees is likewise nondischargeable.

3. THE STRONG SHOWINGS OF THE WIFE AS TO THE SECOND AND THIRD OF THE *GIANAKAS* INDICATORS OVERRIDE THE LANGUAGE OF THE AGREEMENT SUPPORTING THE CONCLUSION THAT THE CREDIT CARD OBLIGATIONS ARE DISCHARGEABLE; THEREFORE, WE CONCLUDE THAT THIS OBLIGATION IS NON–DISCHARGEABLE AS WELL.

■ The original language of Article VI(a) of the Agreement, proffered by the Husband's own counsel, *see* page 441 *supra,* would have stated that the Husband's credit card assumption was "in lieu of,"

and thus was clearly related to, alimony, not a property distribution. However, this language was deleted from the Agreement at the express request of the Wife's counsel, for federal income tax purposes, as she would not then be obliged to report these payments as income. Thus, not only is the obligation to pay the credit card debts juxtaposed in the Agreement with property distribution (Article V) rather than with Support and Maintenance (Article III), but the parties expressly agreed to delete a provision which would have strongly suggested that the payment should be considered as alimony.

The deletion, at the Wife's own request, of an express provision of the Agreement which would have aided her in the assertion that the obligation in issue was to be considered as alimony, would, under normal contract-law principles, support the conclusion that, in the final form of the Agreement, the obligation was *not* to be considered as alimony. Moreover, a possible element of estoppel against the Wife's denial that these payments are not to be considered as alimony is introduced by the fact that, to the Wife's benefit and to the detriment of the Husband, the credit card payments were *not* treated as alimony in the parties' federal income-tax filings. This element is further heightened by comparison with the mortgage payments, which both parties *did* treat as alimony for federal income tax purposes.

However, the *Gianakas* court was careful to note that, as to the first indicator, the language "and substance" of a separation agreement must be considered "in the context of surrounding circumstances." 917 F.2d at 762. The full perspective of the "surrounding circumstances" can be achieved here only by analysis of the entire course of negotiations of the parties regarding the terms of the Agreement, not merely the last phase of the negotiations which resulted in the deletion of certain language from Article VI(a).

Initially, the Wife was in a good negotiating position to claim permanent alimony. Her domestic-relations counsel credibly testified that she had a strong "permanent alimony case." In the Agreement, the term of her alimony was initially reduced to five years, and ultimately to two years, in consideration for the Husband's ultimate assumption of the credit card debts. Thus, the assumption of the credit card debts was, actually, in lieu of additional direct alimony payments, irrespective of the deletion of language expressly so stating.

It should be pointed out that the parties negotiated exchange of permanent alimony for the assumption of these obligations was a fairly even one. Permanent alimony (possibly 35 years at $100 per month, or $42,000) could be compared to two years of alimony ($2,400), two years of mortgage payments (approximately $14,400), plus the credit card debt of $25,500, which is a sum total of $41,800. Thus, it is logical to conclude that the Husband's assumption of the credit card debt was part of an exchange to add certain liabilities to those of the Husband in lieu of permanent alimony.

The other two *Gianakas* indicators continue to favor the Wife. She was the archetype of a dependent spouse. The failure to pay the credit card debts could predictably have jeopardized the Home, since judgments on these debts against the Wife would create liens against the Home, which was placed in her own name under the terms of the Agreement. Therefore, the failure to pay these obligations jeopardized the Wife's maintenance of shelter.

The Husband's counsel suggested at trial that it is relevant to determine who used the credit cards and what was purchased with them in ascertaining dischargeability. He suggested further that, if the Wife used them for luxuries on her own behalf, he should not be liable to pay for them as alimony. We would note, however, that the issue of whether the purchases made were for luxuries or necessaries is not the same as the truly relevant issue of whether the Wife will *now* be deprived of necessaries if the payments are not made.

Nevertheless, several cases have given some consideration to the issue of the nature of credit card purchases in the context of a § 523(a)(5) dispute. *E.g., In re Armento*, 127 B.R. 486, 488, 490 (Bankr.

S.D.Fla.1991) (husband-debtor not discharged because he continued to use credit cards after the parties' separation, apparently to buy items for another woman); *In re Midnet*, 84 B.R. 776, 778, 779 (Bankr. M.D.Fla.1988) (husband-debtor not discharged from debt incurred from his use of the wife's credit card to buy his tools); and *In re Hiller*, 44 B.R. 764, 767 (Bankr. N.D.Ohio 1984) (husband-debtor discharged from credit-card debt in absence of any evidence that purchases were made for necessaries).

The evidence regarding the nature of the purchases on the credit cards here was not completely absent, as in *Hiller, supra*, but it was inconclusive. The Wife could not explain how the bills became so high, but she suggested that the purchases were made for necessary household items and that the balances accrued over a substantial period of time. Indeed, she testified that the bills totalled only about $18,000 at the time of separation and that accrual of finance charges thereafter had increased them to about $25,500. The Husband failed to identify even one luxury-item purchase by his Wife of which he specifically disapproved at the time. Despite his claims of a long-standing rift between the parties on the issue of the Wife's abuse of credit cards, the Husband admitted that he made no effort to take the use and payments of credit cards out of the Wife's control. We therefore have no evidence supporting the conclusion that the charge accounts were not used to purchase necessaries. Certainly, there is no reason to assume that any purchases were made by the Wife for unauthorized personal luxuries for herself.

However, more significant is the fact that, even after he was fully aware of the balances on all of these charge accounts, the Husband agreed to pay for them under the terms of the Agreement. This agreement to pay the credit card debts, it seems to us, superseded any past disputes about the justification for individual purchases made on the accounts. The only significant factor, at that point, became how important these payments were to the ability of the Wife and Stephen to maintain the necessities of life.

We recognize that neither *Gianakas*, nor the pertinent decisions from this jurisdiction—including *Schmiel, supra; In re Jenkins*, 94 B.R. 355 (Bankr.E.D.Pa.1988); or *Pollock, supra*,—involved assumption of credit card obligations. However, the dischargeability of credit card debts has been presented by cases in other jurisdictions, and these cases are worthy of some consideration.

One case addressed an "in lieu of alimony" clause which was *not* deleted from a settlement agreement. In *In re Stranathan v. Stowell*, 15 B.R. 223, 226–27 (Bankr.D.Neb.1981), the court held that, despite the presence of such a clause, the husband's assumption of credit card debt was a property settlement, and not payment of alimony. However, the court based its decision on an analysis of the parties' relevant circumstances, not the language of the parties' separation agreement. *Id.* In *Stranathan*, the husband and wife split the outstanding credit card debt in their separation agreement. *Id.* at 226. Each spouse was employed and they earned approximately equal salaries. *Id.* Their marriage had lasted only three years, produced no children, and provided no reason for either spouse to support the other. *Id.* Thus, despite the presence of an "in lieu of alimony" clause, the nature of the agreement, in the context of the parties' equal financial statuses, was held to render it a property distribution. *Id.*

The results of two other "credit card" cases indicate that the wordings of the respective agreements were not very significant to the respective courts. The husband-debtor in *In re Brand*, 108 B.R. 319 (Bankr.N.D.Ala.1989), agreed to assume $10,000 in credit card debt upon the divorce. The settlement agreement in the case began with the words "wife makes no claim upon husband for payment of alimony." *Id.* at 320. Despite these words, the court said that, in light of the wife's desperate financial conditions, the debt assumption was held to be alimony. *Id.* at 321. Finally, in *Armento, supra*, 127 B.R.

at 489–90, the court similarly noted that, while the clause requiring the husband-debtor to hold the wife harmless from credit card debts appeared in what was distinctly the "property settlement" section of the agreement, and the agreement included a waiver of alimony, the payments on the credit cards were held to be nondischargeable as alimony because the court found that the payments were necessary to support the wife and the parties' child in her custody.

Decisions in two other "credit card" cases appear to emphasize the importance of the agreement's wording. In *In re Stockdill*, 89 B.R. 978 (Bankr.S.D.Fla. 1988), the court decided that a husband's credit card debt assumption represented alimony because a "hold harmless" clause appeared among the provisions dealing with alimony and child support. Conversely, in *In re Winn*, 95 B.R. 839 (Bankr. S.D.Fla.1988), the court found the credit card debt was not alimony because the judgment for the debt assumption was not classified under alimony.

However, we believe that there is a greater degree of consistency in these "credit card" decisions than appears at first blush. All of the decisions which found and focused upon financial disparities between the spouses considered the credit card debt payments to be alimony. *See Armento, supra;* and *Brand, supra. Accord, In re Lariccia,* 110 B.R. 822, 823 (Bankr.N.D.Ohio 1989); and *In re MacDonald,* 69 B.R. 259, 277–78 (Bankr. D.N.J.1986). Cases which focused upon and found no financial disparity between the parties considered the debts to be property distributions. *See Midnet,* 84 B.R. at 770; and *Stranathan, supra,* 15 B.R. at 226. Finally, cases which did not focus at all on the parties' financial disparity reached variant results based exclusively on the texts of the respective agreements alone. *See Winn, supra;* and *Stockdill, supra. Accord In re Cribb,* 34 B.R. 862, 865 (Bankr.D.S.C.1983).

It is clear that, in applying the three-pronged test set forth in *Gianakas,* we cannot join those courts which decline to focus on the parties' financial disparities. *Gianakas* establishes that this issue is crucial, if not overriding, in all § 523(a)(5) disputes. *Compare Jenkins, supra,* 94 B.R. at 362 (payments clearly designated as elements of a property settlement in a separation agreement held to be support to the degree that they were found necessary to provide for the wife's basic needs); and *Buccino, supra,* 397 Pa.Super. at 256–65, 580 A.2d at 21–25 (husband's payments equal to half of the couple's gifts from her parents, half of their equity in a mobile home, and half of the value of his IRA and retirement plan, though apparently facially elements of a property settlement, were held nondischargeable because these payments served the wife's needs). *But see In re Kessler,* 122 B.R. 240, 243 (Bankr. M.D.Pa.1990) (in applying *Gianakas,* the court declines to look past the language of a settlement agreement and determines that husband's obligation to make the wife's car payment is dischargeable). The weight of these decisions favors the position of the Wife. The Husband's bad faith in discontinuing the mortgage payments and his failure to obtain the requisite life insurance also weigh against him.

Therefore, we conclude that the Debtor's obligation to pay all of the credit card debts accumulated by the parties during their marriage is nondischargeable under § 523(a)(5), as well as the other liabilities in issue.

## D. CONCLUSION

An Order consistent with the foregoing Opinion will be entered.

## ORDER

AND NOW, this 1st day of August, 1991, after a trial of July 23, 1991, in the above-captioned adversary proceeding, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of the Defendant, EILEEN BORZILLO, now known as EILEEN ZAPPALO ("the Wife"), and against the Plaintiff–Debtor, ANTHONY J. BORZILLO ("the Hus-

band"), in the above-entitled adversary proceeding on all matters in issue.

2. The following liabilities of the Husband to the Wife under the parties' Separation Agreement of May 17, 1990 ("the Agreement"), in contest are DECLARED to be in the nature of alimony, and therefore non-dischargeable pursuant to 11 U.S.C. § 523(a)(5):

a. Payments on the mortgage on the parties' former marital home at 2 Halley Lane, Sewell, New Jersey 08080, pursuant to Article II, ¶ 5 of the Agreement.

b. Payments to maintain $100,000 of life insurance on the Husband's life, pursuant to Article IV, ¶ 2 of the Agreement.

c. Payment of the parties' credit card debts, pursuant to Article VI, ¶ (a) of the Agreement.

d. Payment of $1,250 of the Wife's counsel fee in the divorce proceedings, pursuant to Article VIII of the Agreement.