**In re Richard C. WEISBERG, Debtor.**

**Richard C. WEISBERG, Plaintiff,**

v.

**Richard A. ABRAMS; Franklin, Weinrib, Rudell & Vassallo, P.C.; and Marie–Laure Weisberg, Defendants.**

**Richard C. WEISBERG, Plaintiff,**

v.

**FRANKLIN, WEINRIB, RUDELL & VASSALLO, P.C.; Marie–Laure Weisberg and Andrew N. Schwartz, Defendants.**

**Bankruptcy No. 97–30006DAS.**
**Adversary Nos. 97–1115DAS, 97–1132DAS.**

United States Bankruptcy Court,
E.D. Pennsylvania.

March 12, 1998.

Eric L. Frank, Philadelphia, PA, for Debtor.

Andrew N. Schwartz, Philadelphia, PA, Trustee.

Brendan J. Sherman, Ciardi, Maschmeyer & Karalis, Philadelphia, PA, for Trustee.

David I. Grunfeld, Philadelphia, PA, for Franklin, Weinrib, Rudell & Vassallo, P.C.

Richard A. Abrams, Franklin, Weinrib, Rudell & Vassallo, New York City, for Defendant.

Frederic Baker, Asst. U.S. Trustee, Philadelphia, PA.

## OPINION

DAVID A. SCHOLL, Chief Judge.

### A. INTRODUCTION (OR "LAWYERS NO LONGER IN LOVE")

The instant two adversary proceedings and the motion for relief from the automatic stay in the Debtor's main case ("the Motion") provide us with an opportunity to bring to an end a grossly overblown domestic dispute between two lawyers, which has devolved into cross-litigation between the husband-lawyer, reduced to the status of a Chapter 7 debtor, and the wife-lawyer's lawyers. We seize this opportunity by holding that whatever is due to the wife-lawyer's lawyers under 11 U.S.C. § 523(a)(5) which remains nondischargeable as to the husband-lawyer, may be set off against the 11 U.S.C. § 362(b) claims of the husband-lawyer and his lawyer against the wife-lawyer's lawyers.

In this process, we principally are construing two statutes, 11 U.S.C. §§ 362(b)(2) and 523(a)(5). We hold that the exceptions to the automatic stay set forth in § 362(b)(2) are narrower than the scope of the obligations deemed nondischargeable by operation of § 523(a)(5). We therefore conclude that the Wife's lawyers are clearly liable for damages and attorney's fees for attempting to proceed with various state court actions aimed principally at collecting their fees from the Debtor. We also hold that the Wife's particular circumstances, including the ultimate abandonment of her custody and support claims and her continuous substantial income and access to very substantial assets, diminish her counsel's claim that a previous interim attorney's fees award of $85,000 is nondischargeable as incurred in connection with support, to the extent that we find that it can and should be set off against the Debtor's damages in his claims pursuant to 11 U.S.C. § 362(h). We also hold that no claims for further attorneys' fees should be determined to be within the scope of § 523(a)(5) under these circumstances, although we reject the Debtor's argument that such claims could not, under any circumstances, be ascertained and then declared nondischargeable by this court itself,

in the absence of a prior state court fee award. Since this disposition eliminates any reason to proceed further in state court on most of the issues raised in the Motion, and the remaining rather minor issues appear better resolved through the claims process or elsewhere here, the Motion will be denied.

## B. PROCEDURAL AND FACTUAL HISTORY

RICHARD C. WEISBERG ("the Debtor") is a 45-year-old lawyer, the son of a "retired" Philadelphia lawyer, who filed the individual voluntary Chapter 7 bankruptcy case underlying the disputes before us on August 15, 1997. By the late 1980s the Debtor had become a partner in a New York City law firm, Simpson, Thatcher and Bartlett ("the Simpson Firm"). While approaching the height of his career, at which time his annual salary exceeded $1 million annually, he met and married, on March 14, 1990, MARIE–LAURE WEISBERG ("the Wife"), a French-born lawyer, the daughter of a French lawyer, who herself was earning and has continued to earn income in the $80,000 annual range as in-house counsel for the Chanel Company. The couple had two children, Maximilien, born shortly after the marriage on April 28, 1990, and Charlotte, born October 20, 1991.

This marriage was short-lived. By August 11, 1994, the Wife had filed for divorce in the Supreme Court of New York County in New York City, N.Y. ("the N.Y. Court"). In that action, the Wife sought a full panoply of relief, including custody of the children, equitable distribution of property, and child and spousal support.

As might be expected in a contest between second-generation lawyers with income sufficient to satisfy their inclination to hire more legal talent, the divorce proceeding was characterized by both parties' unbridled zeal for litigation. The Wife hired the firm of FRANKLIN, WEINRIB, RUDELL & VASSALLO, P.C. ("FWRV"). The Debtor hired three different attorneys at various points and was also provided legal services by his father and himself. Each party appears to have opposed nearly every motion or application made by the other. Moreover, both party's lawyers claim that the relationships between opposing counsel were the most rancorous in their memory. And, as noted *infra*, the lawyers billed accordingly.

The parties were residing together in a an expensive New York City apartment when the divorce began. Under pressure from the N.Y. Court, the Debtor eventually moved out of the marital residence, which at that time the Wife and the children continued to occupy. That action prompted the Wife to move for an order for *pendente lite* child and spousal support. Based on the parties' lifestyle during the marriage, this request featured the Wife's demands for the following *monthly* expenses: $800 for dining out, $1,400 for groceries, $4,000 for clothing, $433 for her therapy, $860 for a housekeeper, $500 for a weekend baby sitter, and $1,150 for the combination of yoga instruction, exercise classes, a health club membership, and a personal trainer.

Determining that the Wife possessed the ability to support herself, the N.Y. Court turned down her request of maintenance in the form of cash payments. The N.Y. Court did, however, award the Wife $20,000 interim attorneys' fees out of a requested amount of $35,000 on October 13, 1994. A year later, in an order dated October 25, 1995, the N.Y. Court granted to the Wife a substantial award of child support, requiring the Debtor to pay the apartment rent in the amount of $3,000 per month; all utility and insurance payments; $1,000 per week cash; maintain health insurance for the Wife and children; pay in full all of the Wife's and the children's unreimbursed health care costs; and pay the full cost for the children's private schools. This order also awarded the Wife $25,000 out of a $50,000 request for additional interim attorneys' fees. After the entry of the latter order, no apparent effort was made to modify its interim support terms, and it remained in place for the duration of the divorce action. The Debtor paid the $20,000 and $25,000 awards, plus a $2,000 award, in consideration of a request for $3,500, on March 28, 1996.

A significant aspect of the Debtor's litigation strategy was to demonstrate that the Wife had access to substantial assets by inheritance from her family in France. The

purpose of this strategy was to support an argument that the Wife had the ability to make a substantial contribution to the children's support and to show that the Wife had the ability to pay her own legal fees. To this end, the Debtor first sought and obtained letters rogatory requesting that the Wife's father, Michael DuCamp, answer questions concerning the scope of the family's wealth and the nature of the Wife's interests therein. When the results of this inquiry proved inconclusive, the Debtor hired a French attorney, Kenneth M. Weissberg (no relative!), to bring discovery proceedings against Du-Camp in France.

The outcome of this effort was the French court's appointment of an expert to evaluate DuCamp's wealth and determine the nature and extent of the Wife's interest therein. The report establishes that the DuCamp family is very wealthy and owns property worth millions of dollars. However, the report did not relate the amount of the debt on the property, and thus the net value of the family's holdings is unclear. The report did reveal that the Wife holds legal, though not necessarily equitable, title to certain property and business interests in France and established that, despite some apparent degree of estrangement from her family, she could not be disinherited under French law. The Debtor spent $100,000 in legal fees for his French attorney's efforts and $20,000 to the French expert appointed to investigate the matter. All of the Debtor's efforts to obtain information about the Wife's French assets were vigorously opposed by the Wife and/or her family and litigation surrounding this issue undoubtedly ran up FWRV's fees.

At the outset, both the Debtor and the Wife both sought primary custody of the children, making custody the most significant issue in the case. In addition to the ultimate question of who would obtain custody at the end of the proceeding, the litigation was peppered with a number of interim custody disputes concerning the issue of the Debtor's partial custody during the pendency of the proceeding and the Wife's travels with the children to France. The parties do not dispute that custody was the single most significant issue in the case. FWRV answered interrogatories in the instant case by stating "[b]y far, the greatest portion of our charges were incurred in connection with the issues of custody and visitation." These issues ranged from being called upon to address numerous day-to-day custody disagreements, participating in the litigation of eleven (11) separate motions relating to different aspects of custody, and preparing for and beginning the trial of the parties' custody dispute. The custody trial itself began in January 1997, and was litigated over the course of eighteen (18) separate dates until it was stayed by the Debtor's bankruptcy filing on August 15, 1997.

FWRV claims to have amassed total fees and disbursements amounting to $720,838.93 as of August 14, 1997, in consideration for its representation of the Wife's interests in the divorce action. According to its answers to interrogatories, FWRV was paid only $3,500 by the Wife herself and, with the Debtor's payment of $47,000, has received $50,500 and thus is still owed $669,838.93.

On February 11, 1997, the N.Y. Court also awarded FWRV $85,000 in interim counsel fees in response to its request for interim fees in the amount of $300,000. In making this award the N.Y. Court, per the Honorable Sherry Klein Heitler, stated as follows:

This is a long pending, much litigated matrimonial action. The action was commenced in 1994 and same is presently on trial before this court. The trial of this action commenced in January of 1997. It appears that the trial will be a lengthy one, and due to the complexity of the issues raised and extensive proof and testimony which is expected, same will not be completed for several months.

Domestic Relations Law Section 237 permits the court in its discretion to require a spouse to pay counsel fees in order to enable the other spouse to carry on or defend the action as justice requires, having regard to the circumstances of the case and of the respective parties (*DeCabrera v. Cabrera–Rosete*, 70 N.Y.2d 879, 524 N.Y.S.2d 176, 518 N.E.2d 1168 [1987]; *see also, Bricker v. Powers,* 208 A.D.2d 463, 617 N.Y.S.2d 309 [1st Dep 1994]; *Plawner*

*v. Plawner,* 208 A.D.2d 408, 617 N.Y.S.2d 172 [1st Dept.1994]).

The court having considered the relative financial circumstances of the parties, and the expected lengthy and protracted proceedings which remain, determines in its discretion that a further interim award of pendente lite counsel fees is warranted in this instance.

This award was appealed by the Debtor, who obtained a stay pending appeal by posting a supersedeas bond, apparently $85,000 in cash. He disputed, *inter alia,* the procedures employed, since all of the interim fees awarded were granted on affidavits of Wife's counsel without evidentiary hearings at which he could have disputed the interim fee request.

The Debtor described his involvement in the N.Y. Court action as including the supplying of his attorneys with fully prepared pleadings and memoranda. By the time of his bankruptcy filing he had discharged all of his attorneys and was proceeding *pro se.* He claims that he lost his first lawyer as a result of that lawyer's pregnancy and subsequent inability to represent him. He did not say what caused him to discharge his second lawyer, but he blames a fee dispute as the cause for parting with his third attorney.

In all the Debtor claims to have spent about $400,000 on attorneys for his own representation in the N.Y. Court. His final attorney, with whom he had the fee dispute, was not paid and is listed as a creditor on his bankruptcy petition in the amount of $274,-841.89. Also listed as a creditor on his petition is the Debtor's father, for legal services in the amount of $700,000 of fees incurred in connection with the divorce. How this debt was computed was not explained. It appears to represent a very generous allotment to the father.

Between August 1997 and December 1997 the Debtor's life and the domestic disputes at issue took several dramatic turns. On August 14, 1997, the Debtor ceased being employed with the Simpson Firm and has remained basically unemployed since. The Debtor attributed this separation to the strain of the divorce proceeding over a three year period, exacerbated by his extensive personal involvement in his own representation, which caused his job performance to suffer to the point where his partners at the law firm asked for his resignation. This development was probably not sudden nor unexpected, because, on the very next day, August 15, 1997, it will be recalled that the Debtor filed the instant bankruptcy case in this jurisdiction.

Venue in this jurisdiction was justified because the Debtor, apparently after departing from the marital home in 1995, took up residence with his parents in Merion, Pennsylvania, a fashionable suburb on the Philadelphia Main Line. Thus, in the course of two days, the Debtor went from a job earning about $1 million annually to living with his parents, without work and with all of his assets exposed to liquidation in a Chapter 7 bankruptcy.

While a bankruptcy filing might normally have been expected to cease all litigation in which the Debtor was a defendant, *see* 11 U.S.C. §§ 362(a)(1), (a)(2), (a)(3), (a)(4), (a)(6), in this case the opposite occurred. Filings in the New York courts continued, and the bankruptcy court emerged as another jurisdiction in which the parties could and did proceed to litigate. The Wife, has, however, been conspicuously absent from the latest round of litigation in this court.

In an apparent panic over the prospect of not being paid the large fee balance which it undoubtedly intended to collect in large part from the Debtor rather than from the Wife, FWRV proceeded to file several motions in the N.Y. Court following the commencement of the Debtor's bankruptcy. On August 22, 1997, FWRV filed what appears to be a motion of an emergency *ex parte* nature, prompting a hearing on the same day. Among other things, as a result of this motion, FWRV convinced the N.Y. Court to order the sequestration of a variety of the Debtor's assets, including interests in partnerships in which the Debtor was involved as well as monies due to him from the Simpson Firm. The entry of this order prompted FWRV to send out letters to several partnerships and to the Simpson Firm notifying them of the sequestration of the Debtor's

assets and requesting that arrangements be made to facilitate a deposit of the Debtor's interests with the N.Y. Court.

On or about August 28, 1998, FWRV filed another motion in the N.Y. Court. The principal purpose of this motion was to have the court authorize payment to it of the balance of FWRV's fees in the amount of $665,000, as a support obligation of the Debtor. The motion was supported by the affidavit of John Vassallo, a partner at FWRV, and was notable for its highly charged emotional content and personal attacks upon the Debtor. For no other apparent purpose other than harassment, the motion requested that all of the Debtor's visitation with his children be supervised and that he be ordered to submit to a psychiatric examination. The basis for FWRV's uneasiness appears to have been the Debtor's new status of being unemployed and, of course, his bankruptcy filing, and the obviously detrimental effect these events had on FWRV's chances of being paid. In fact FWRV stated in the motion that it could not continue to represent the Wife without receiving payment from the Debtor.

The instant filings generated the first activity to occur in this case, the filing of a motion by ANDREW SCHWARTZ, ESQUIRE ("the Trustee"), seeking injunctive relief against FWRV and the Wife for violating 11 U.S.C. § 362(a). The Trustee alleged in his motion that FWRV was attempting to execute a support order against property of the estate, which he contended included the limited partnership interests of the Debtor and the Debtor's prepetition interest in the Simpson Firm at issue.

The filing of this Motion did not stop FWRV from filing, on September 19, 1997, yet another motion, this time in the Appellate Division of the N.Y. Court, requesting that the Debtor's appeal of the $85,000 order for *pendente lite* attorney's fees entered on February 11, 1997, be dismissed on account of the Debtor's failure to perfect same. The primary objective of this filing was apparently to attempt to obtain possession or sequestration of the appeal bond, despite the fact that the Debtor's interest in the bond was by this time property of his bankruptcy estate. *See* page 763 n. 3 *infra.*

Back in this court, an initial hearing on the Trustee's motion, scheduled on September 25, 1997, was continued until October 9, 1997, at which time the parties appeared and announced that they reached a settlement. Pursuant thereto, FWRV and the Wife agreed not to make any further attempts to collect support from property of the Debtor's estate. A stipulation memorializing this settlement was filed with the court on October 25, 1997. We note that, at the October 9, 1997, hearing, we admonished FWRV not to take any further action whatsoever against the Debtor without first obtaining relief from the automatic stay. FWRV's New York counsel who attended this hearing indicated his understanding and apparent assent to our directives.

Nevertheless, on or about November 3, 1997, FWRV filed another motion in the N.Y. Court. In this motion FWRV sought to have that court determine that the attorneys' fees due the firm pursuant to the February 11, 1997, order and the $665,000 believed requested in the post-petition motion filed in the N.Y. Court on August 28, 1997, were nondischargeable support obligations.

This filing was apparently the impetus for the Debtor's filing, on November 11, 1997, the first of the above captioned adversary proceedings, Adversary No. 97–1115 ("the First Proceeding"), claiming that FWRV; one if its attorneys, RICHARD A. ABRAMS, ESQUIRE; and the Wife were continuing prepetition proceedings against him in violation of the automatic stay. In the First Proceeding the Debtor sought injunctive relief, damages, and (of course) attorneys' fees for his bankruptcy lawyer. Contemporaneously with the filing of the First Proceeding, the Debtor filed motions for a temporary restraining order and preliminary injunction and for an expedited hearing. The motion for an expedited hearing was granted, but on the date of the hearing, set for November 11, 1997, the Debtor withdrew the motion, having apparently reached some accommodation with the wife-lawyer's lawyers, who now were represented by a local lawyer, whom we might refer to as the wife-lawyer's lawyers' lawyer.

A trial of the First Proceeding was scheduled for and conducted on December 16, 1997. Thereafter, the Debtor was given until December 29, 1997, to file his brief and the Defendants were accorded until January 9, 1998, to respond.

FWRV's filing of the Motion addressing dischargeability of its claim for attorneys' fees in the N.Y. Court also prompted the Debtor, on November 13, 1997, to file a notice of removal of the dischargeability action from the N.Y. Court to this court under Adversary No. 97–1119 ("the Second Proceeding"). The Second Proceeding was abandoned when the Debtor realized that he was initially obliged to remove this matter to the New York federal district court, not this court. *See* 28 U.S.C. § 1452(a); and *In re Gross Metal Products, Inc.*, 1997 WL 778756, at *2 (Bankr.E.D.Pa. Dec. 16, 1997).

The Debtor's other adversary proceeding presently before us, Adversary No. 97–1132 ("the Third Proceeding"), was filed on November 17, 1997. FWRV, the Wife and the Trustee were named as defendants. In the Third Proceeding, the Debtor raises, from his perspective, the issue of whether FWRV's claim for attorney's fees should be determined to be dischargeable.

On or about December 1, 1997, the Debtor attempted again to remove FWRV's dischargeability motion from the N.Y. Court, this time properly removing it to the United States District Court for the Southern District of New York ("the SDNY"). In response, FWRV filed, on December 9, 1997, a motion in the SDNY seeking to obtain an injunction against the Debtor which would prevent him from prosecuting the Third Proceeding in this court. FWRV's motion in the SDNY was never ruled upon because the SDNY, on December 16, 1997, issued a terse order remanding the dischargeability motion to state court. Although it was not expressly stated, the SDNY's action was apparently prompted by its perception that the entire matter was stayed by this bankruptcy proceeding, and for that reason the court admonished the Debtor for continuing to take action in a stayed proceeding.

FWRV also filed a motion in this court, on December 16, 1997, seeking to have us abstain from hearing the Third Proceeding ("the Abstention Motion"), arguing that issues raised in that Proceeding were already pending before the New York courts. And, finally, on December 26, 1997, FWRV, by the Wife-lawyer's lawyers' lawyer, filed, for the first time throughout this spate of litigation, a motion seeking relief from the automatic stay to proceed against the Debtor, which is the Motion before us for decision with the First and Third Proceeding.

The Motion is in two Counts. The first seeks permission to proceed with the dismissal of the Debtor's appeal from the February 11, 1997, N.Y. Court order. The second Count seeks a determination that the N.Y. Court litigation is excepted from the stay under 11 U.S.C. § 362(b)(2), or, in the alternative, relief to pursue that litigation for cause. The Motion was scheduled for a hearing on January 20, 1998.

On December 30, 1997, after brief argument from the parties on certain discovery issues and that Motion, we denied the Abstention Motion, reasoning that the § 523(a)(5) issues involved therein were federal law issues which we could decide in conjunction with the First Proceeding and all other matters related to the Debtor's assets and claims which would be before us in the Debtor's main bankruptcy case. *See, e.g., In re R.T. Opdenaker & Sons, Inc.*, 1996 WL 332403, at *4–*6 (Bankr.E.D.Pa. June 11, 1996) (the main consideration in discretionary abstention involve weighing the impact of a proceeding in a bankruptcy case against the bankruptcy court's delving into unsettled state-law issues). On December 30, 1997, we also agreed to continue the trial of the Third Proceeding, scheduled on January 8, 1998, until January 20, 1998, the date of the hearing on the Motion.

The parties agreed that the record of the trial of the First Proceeding could be incorporated into the joint record to be compiled in connection with the trial of the Third Proceeding and the hearing on the Motion. The trial was conducted for about four hours on January 20, 1998, and another four hours in the afternoon of January 22, 1998. Thereafter, we gave the parties the opportunity to

simultaneously file opening briefs by February 17, 1998, and reply briefs by February 27, 1998.

All of the witnesses at the trials of both Proceedings were, as might have been expected, *lawyers*. The Debtor and Abrams were the sole witnesses at the December 16, 1997, trial of the First Proceeding. At the Third Proceeding trial, the Debtor called Myra Freed, the Debtor's first attorney in the N.Y. Court; Kenneth M. Weissberg, who related his findings regarding the Wife's French assets; and testified again himself. FWRV called two of its partners, Vassallo and Abrams, as its sole witnesses.

Among the exhibits were FWRV's invoices reflecting time entries for services performed on behalf of the Wife from October 20, 1993, through August 29, 1997. However, the entries are terse and generic (*e.g.*, "Conf. Client," "Telephone Client," "Telephone Calls," "Letter(s) Att'y," "Research Lexis") and provide no clue as to what specific services or activities to which the entries pertain. In responses to discovery and by way of Abrams' testimony, FWRV admitted that by far the greatest portion of its services were incurred in connection with custody and visitation of the children and that it was able to break down only about one-third of its time entries by category. Abrams nevertheless contended that over seventy (70%) percent of the time which it could allocate was attributable to "support"-related as opposed to "property"-related activities.

The Debtor testified that as a result of losing his job, his income ceased except for occasional small legal engagements. Therefore, as of August 15, 1997, he stated that he no longer had any money or assets from which his support obligations to the Wife and his children could be satisfied. As a result, all of his support payments ceased. The Wife, apparently no longer able to support herself in the couple's former marital residence, moved out under threat of eviction.

In December 1997, for reasons which have never been explained first-hand by the Wife on the record, but which we surmise were economically driven, the Wife agreed with the Debtor that she would relinquish custody of the children to the Debtor and that the

children would begin residing with the Debtor in his parents' home, subject to liberal visitation. Also, the Debtor and the Wife agreed to dismiss the N.Y. Court action and seek an uncontested divorce in Pennsylvania at a later date. Pursuant to this agreement, the Debtor and Wife, both acting *pro se*, filed a stipulation of discontinuance in the N.Y. Court on or about December 2, 1997, containing the specific points of their agreement. Of particular interest in the agreement was the Wife's relinquishment of her claims for support, maintenance, and property, as well as her claims for the Debtor's payment of any of her remaining attorneys' fees.

FWRV contends that, despite the filing of this stipulation, the N .Y. Court would not automatically dismiss the action because FWRV's application for attorneys' fees is still pending. Thus, it seems that the corollary to the rule of "Mo' Money, Mo' Problems," *i.e.*, less money, less problems, has prevailed in the efforts of the Debtor and the Wife to settle their differences, although the attorneys' fee issues arising out of the N.Y. Court proceeding cause that action to outlive the parties' seemingly irresolvable personal disputes.

On February 26, 1998, we granted the Debtors contested motion to enter the parties' comprehensive *pro se* Marital Settlement Agreement, dated February 3, 1998, as part of the record before us. We denied the request to add the Complaint in a divorce action initiated by the Debtor in Pennsylvania on February 4, 1998, of record.

## C. DISCUSSION

1. *FWRV's Actions in Violation of the Automatic Stay Are Not Within the Exception of 11 U.S.C. § 362(b)(2) and Would Warrant Substantial Monetary Sanctions in Favor of the Debtor.*

Numerous subsections of 11 U.S.C. § 362(a), specifically §§ 362(a)(1), (a)(2), (a)(3), (a)(4), and (a)(6), impose an automatic stay on any actions by any entities seeking to commence, continue, enforce, or proceed with any action to assert pre-petition claims against a debtor while the debtor's bankruptcy case is pending unless relief from the

automatic stay is first obtained pursuant to 11 U.S.C. § 362(d). Further, 11 U.S.C. § 362(h) states that any debtor "injured by any willful violations of the stay ... shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages" against the transgressor. The only perceptible applicable statutory defense to the Debtor's claim under § 362(h) in the First Proceeding arises from 11 U.S.C. § 362(b)(2), which provides as follows:

> (b) The filing of a petition ... does not operate as a stay—
>
> ...
>
> (2) under subsection (a) of this section—
>
> (A) of the commencement or continuation of an action or proceeding for—
>
> ...
>
> (ii) the establishment or modification of an order for alimony, maintenance, or support; or
>
> (B) of the collection of alimony, maintenance, or support from property that is not property of the estate.

It is clear that FWRV committed multiple violations of 11 U.S.C. § 362(a) by attempting to take numerous actions against the Debtor after he filed his bankruptcy petition with this court on August 15, 1997, without first obtaining relief from the automatic stay. This conduct is rendered particularly egregious by the fact that we specifically advised FWRV against any further actions when their initial conduct was first brought to our attention on October 9, 1998. Despite personal assurances to this court to the contrary, FWRV nevertheless proceeded to ignore the pronouncements of this court and continued to pursue its claims against the Debtor in the N.Y. Court and other New York courts. Specifically, on August 28, 1997, FWRV filed a motion in the N.Y. Court requesting, among other things, additional *pendente lite* attorneys' fees of $665,000, and a determination that such fees were nondischargeable in his bankruptcy case. On September 4, 1997, FWRV sent letters to several partnerships, corporations, and other entities in which it believed the Debtor had an ownership interest regarding the amount, if any, of Debtor's assets in the possession of those entities. On September 19, 1997, FWRV filed a motion seeking to dismiss the Debtor's appeal of the N.Y. Court order of February 11, 1997.

Unfazed by its assurances to the court on October 9, 1997, after we approved the stipulation with the Trustee in which FWRV agreed not to further pursue any assets of the Debtor's bankruptcy estate without first obtaining relief from the automatic stay, FWRV, about one·week later, filed a motion seeking a determination of the dischargeability of its attorneys' fees with the N.Y. Court. Although, on November 11, 1997, FWRV entered into an agreement with the Debtor to withdraw the foregoing motion, it subsequently sought, on December 10, 1997, a preliminary injunction and temporary restraining order in the SDNY to attempt to enjoin the Debtor from prosecuting his adversary complaint in this court.

█ As this court indicated in its reasoning in *In re Sokoloff*, 200 B.R. 300, 300–01 (Bankr.E.D.Pa.1996), 11 U.S.C. § 362(b)(2) is a narrow exception to § 362(a). *See also In re Simpson*, 140 B.R. 857, 859 (Bankr. E.D.Pa.1992) (all proceedings not strictly within the scope of § 362(b) are stayed by a bankruptcy filing, including divorce and custody proceedings against a debtor); and 3 COLLIER ON BANKRUPTCY, ¶ 362–51 & n. 26 (15th ed. rev.1997) (exceptions to the automatic stay are narrowly construed, citing *Pennsylvania Dep't of Public Welfare v. Davenport*, 495 U.S. 552, 560, 110 S.Ct. 2126, 2131–32, 109 L.Ed.2d 588 (1990)). It excepts only the commencement and continuation of actions which establish or modify support orders from the automatic stay. The express statement in § 362(b)(2)(B) that it includes only collection of support from property which is not property of the estate makes it clear that attempts to effect collection of support from property *of* the estate are not excepted from the stay.

None of FWRV's post-petition actions were in the nature of efforts to commence or modify support orders. The only support order entered in this case was the interim order of October 25, 1995, in the N.Y. Court. Neither party appealed nor attempted to

modify the terms of this order at any time. Hence, no commencement or modification of any support order in favor of the Wife has been at issue since 1995.

■ Although § 362(b)(2)(B) would generally permit the spouse of a Chapter 7 debtor to collect support from the debtor's postpetition earnings, *see Carver v. Carver*, 954 F.2d 1573, 1577 (11th Cir.1992); and *Sokoloff, supra*, 200 B.R. at 300 (collection precluded from post-petition earnings of a Chapter 13 debtor, which are property of the debtor's estate), the instant Debtor had little or no earnings and FWRV made no effort to collect from any earnings. There is no indication that the Wife made any effort to collect support from any income source available to the Debtor after he left his job at the Simpson Firm. FWRV's efforts to pursue such obvious estate property as the Debtor's interests in partnerships and the Simpson Firm have no conceivable basis in § 362(b)(2). We further hold that there is no language in § 362(b)(2), like the language in § 523(a)(5) referencing actions "in connection with" support, which even arguably extends the scope of § 362(b)(2) to cover collection of attorneys' fees for a support-plaintiff's counsel. *Accord, In re Campbell*, 185 B.R. 628, 630 (Bankr.S.D.Fla.1995).

■ In its defense FWRV, without case support, offers a few feeble arguments. First, it argues that it was permissible for the N.Y. Court, concurrently with this court, to decide whether § 362(b)(2) applied to the matters before it, and therefore its filing various motions in the N.Y. Court without first seeking relief from this court was justifiable.

■ However, the law of this Circuit squarely places the determination of whether the automatic stay applies to a certain action in the sole domain of the debtor's bankruptcy court. *See Constitution Bank v. Tubbs*, 68 F.3d 685, 691 (3d Cir.1995); *Maritime Electric Co. v. United Jersey Bank*, 959 F.2d 1194, 1204 (3d Cir.1991); *In re Izzi*, 196 B.R. 727, 730 (Bankr.E.D.Pa.1996); and *In re*

*Ford*, 188 B.R. 523, 526 (Bankr.E.D.Pa.1995), *aff'd*, C.A. No. 5–7810 (E.D.Pa. Oct. 2, 1996), *aff'd*, 116 F.3d 467 (3d Cir.), *cert. denied sub nom. Ford v. Philadelphia Federal Credit Union*, —— U.S. ——, 118 S.Ct. 422, 139 L.Ed.2d 323 (1997). *Accord, Cathey v. Johns–Manville Sales Corp.*, 711 F.2d 60, 63 (6th Cir.1983). *But see In re Baldwin–United Corp.*, 765 F.2d 343, 347 (2d Cir.1985).[1]

■ Any attempt to compromise this rule by a holding that nonbankruptcy courts can construe the scope of the stay, as argued by FWRV, is an attempt to engraft an exception which would compromise if not swallow this rule. The purpose of the stay is to automatically protect the debtor from appearing in a nonbankruptcy forum to convince a nonbankruptcy court not to proceed against the debtor. This very fundamental bankruptcy protection would be severely compromised by the corollary suggested by FWRV.

Next, FWRV attempts to borrow two concepts from the caselaw construing § 523(a)(5) without even stopping to consider, as we do at page 752 *supra*, that the language of § 523(a)(5) is much broader than that of § 362(b)(2). Dischargeability and relief from the stay are entirely different concepts. For the short period of its duration, the stay prevents all actions against the debtor from going forward, even those in pursuit of nondischargeable obligations not squarely within the scope of § 362(b). Dischargeability pertains to the ability of a creditor to collect a claim after the stay has expired. Therefore, we reject any attempt to apply the concept that § 523(a)(5) may include claims of attorneys' fees of a nondebtor spouse to analysis of § 362(b)(2). *Accord, Campbell, supra*, 185 B.R. at 630.

■ The remainder of FWRV's defenses are variations on the theme that it should be excused from liability because it subjectively believed that it had a right to proceed as it did. This defense rings extremely hollow when it is remembered that the court's warnings and FWRV's promises of October 9, 1997, resulted in no abatement of its actions

---

1. Although the law of the Second Circuit is apparently different from that of the Third Circuit on this point, the issue at hand is a strictly federal bankruptcy law question which is controlled by the bankruptcy law applicable in this Circuit.

in violation of the stay. Moreover, as this court noted in *In re McLaughlin*, 96 B.R. 554, 557–60 (Bankr.E.D.Pa.), *aff'd*, C.A. No. 89–2279, 89–3672, 89–3748 (E.D.Pa. Sept. 18, 1989), "good faith" is not a defense to an award of damages or attorneys' fees in a § 362(h) motion. *Accord, In re Lansdale Family Restaurants, Inc.*, 977 F.2d 826, 829 (3d Cir.1992). If the law were otherwise, it would discourage the relatively painless failsafe of asking the bankruptcy court whether a doubtful action can proceed before it is taken. *See also In re Daugherty*, 117 B.R. 515, 517 (Bankr.D.Neb.1990) ("if there is any doubt as to whether Section 362(b)(2) applies, the prudent practitioner should seek relief prior to filing an action in state court").

One violation of the automatic stay may have been overlooked, particularly those occurring in August just after the Debtor filed his bankruptcy petition. However, FWRV filed actions again and again in various courts before seeking relief in this court. Its violations of the automatic stay were, accordingly, inexcusable and multitudinous. There is no acceptable excuse for the continued subsequent violations, particularly after being advised that such conduct was actionable by the Trustee as well as this court. The totality of FWRV's actions leads this court to the conclusion that its actions were repeatedly in willful contravention of § 362(a) in the worst sense.

 It is clear that damages in some amount are mandatory whenever a stay violation occurs. *See Price v. Pediatric Academic Ass'n Inc.*, 175 B.R. 219, 221 (S.D.Ohio 1994); *In re McCrosson*, 1997 WL 47625, *2 (Bankr.E.D.Pa. Feb. 3, 1997); and *In re Brock Utilities & Grading, Inc.*, 185 B.R. 719, 720 (Bankr.E.D.N.C.1995). When bankruptcy courts perceive that a party has repeatedly, intentionally, and without excuse violated the terms of the automatic stay, they have not hesitated to impose stiff sanctions. *See, e.g., In re Rhodes*, 155 B.R. 491, 495 (W.D.Ark.1993) (court affirms an offset of an entire prepetition tax claim of $12,313.92 asserted by the Internal Revenue Service against its liabilities for violating the automatic stay); *In re Chavis*, 213 B.R. 462, 464 (Bankr.E.D.N.C.1997) (court fined creditor

$10,000 for sending certain collection letters to the debtor); *In re McCormack*, 203 B.R. 521 (Bankr.D.N.H.1996) ($10,000 sanction imposed for failure to delete disallowed attorneys' fees from statements); *In re Toll*, 175 B.R. 406, 409 (Bankr.S.D.Ala.1994) (court awards damages of $1,000 for each of five days, $10,000 punitive damages, plus attorneys' fees against a creditor who removed the debtor's household goods in violation of the automatic stay); and *In re B. Cohen & Sons Caterers, Inc.*, 97 B.R. 808, 816–19 (Bankr.E.D.Pa.), *aff'd in part & remanded in Part*, 108 B.R. 482 (E.D.Pa.1989), *appeal dismissed*, 908 F.2d 961 (3d Cir.1990), *clarified on remand*, 1990 WL 2632 (Bankr.E.D.Pa. January 11, 1990), *aff'd*, 124 B.R. 642 (E.D.Pa.), *aff'd*, 944 F.2d 896 (3d Cir.1991) (debtor awarded $50,000 actual damages, $10,000 punitive damages, the striking of a proof of claim filed in the amount of approximately $270,000, plus attorneys' fees for landlord's destruction of the debtor's property in violation of the automatic stay). Furthermore, in *McLaughlin, supra*, 96 B.R. at 560, we noted not only must § 362(h) be broadly construed so as to discourage creditors from violating the automatic stay and to give bankruptcy judges the ability "to impose a range of stiff penalties if stay violations nevertheless take place," but also we emphasized that an award of attorneys' fees follows a § 362(h) award almost as a matter of cause. *Id.* at 562–63.

Driven as these proceedings have been by FWRV's unceasing attempts to collect attorneys' fees and in the context of the amounts of fees expended by the parties which have been bandied about (the $700,000 range), the prospect of a recovery of attorneys' fees on the part of the Debtor's counsel should give FWRV cause for discomfiture. The Debtor's counsel filed a detailed complaint, expended a full day of trial, and submitted a lengthy, comprehensive brief on the § 362(h) issue. The final award due for compensation, punitive damages, and attorneys' fees could be quite substantial.

 However, as we stated at the outset, *see* page 744 *supra*, and emphasize again at page 763 *infra*, our goal is not to encourage more activities of lawyers, even so much as

the preparation of an attorneys' fee application by the Debtor's counsel under § 362(h), but to bring litigation to a conclusion. Rather than requiring this attorneys' fee recovery process to begin, we will simply set off the Debtor's entire § 362(h) claim, including any component for attorneys' fees, against the potentially dischargeable claims of FWRV against the Debtor under § 523(a)(5).

> 2. *FWRV Is Entitled to a Declaration that Some Portion of Its Claimed Attorneys' Fees Are Nondischargeable Under § 523(a)(5); However, Due to FWRV's Inability to Meet Its Burden of quantifying This Figure, We Hold that the Amount Which is Nondischargeable Will Be Offset by the Debtor's § 362(h) Claims Against FWRV.*

> a. *This Court's Prior Decisions Regarding Dischargeability of Attorneys' Fees Awards In Favor of Nondebtors' Counsel Under § 523(a)(5) Have Permitted Only Modest Recoveries and Only in Circumstances in Which Counsel Met Its Burden of Having a Close Relationship of Services Charged to Support.*

The issue which has driven the parties' disputes for some time and has driven FWRV to the point where it has exposed itself to the Debtor's claims under § 362(h) is the dispute which is addressed head-on in the Third Proceeding. That is the issue of what portion if any of FWRV's remaining claim of attorneys' fees alleged expended on behalf of the Wife, which FWRV values at approximately $670,000, can be deemed nondischargeable against the Debtor under 11 U.S.C. § 523(a)(5).

We begin by quoting § 523(a)(5):

(a) A discharge under section 727, . . . of this title does not discharge an individual debtor from any debt—

. . .

(5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

> (A) such debt is assigned to another entity, voluntarily, by operation of law, or otherwise . . . or

> (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support.

This court has addressed the application of § 523(a)(5) in the context of claims for attorneys' fees against a debtor by the non-debtor spouse and the nondebtor spouse's counsel at some length in two cases, *In re Borzillo*, 130 B.R. 438, 445 (Bankr.E.D.Pa.1991); and *In re Schmiel*, 94 B.R. 373, 379–81 (Bankr. E.D.Pa.1988). In addition, we recently touched upon related issues in *In re Bryer*, 216 B.R. 755, 762–63 (Bankr.E.D.Pa.1998); and *In re Simeone*, 214 B.R. 537, 546–47 (Bankr.E.D.Pa.1997).

In *Schmiel* we were faced with the question of whether an attorneys' fee award of $11,500 in favor of a nondebtor wife, included in a divorce decree but not specified as either part of the property settlement or the support award, was nondischargeable. In contrast to the Debtor's claim here that the Wife had an undisclosed interest in valuable French assets, in *Schmiel* the nondebtor wife had expended $55,402.24, which it seemed to us at the time was a very large sum, on attempting to prove that the debtor's family owned valuable assets in Germany which the debtor was concealing. 94 B.R. at 377, 378, 379–80.

The beginning point for our *Schmiel* analysis, 94 B.R. at 379, was our adoption of the reasoning of Judge Twardowski in *In re Pollock*, 90 B.R. 747, 759 (Bankr.E.D.Pa.1988), that the party attempting to impose an order of nondischargeability upon a debtor must meet the evidentiary burdens necessary to satisfy the criteria for nondischargeability. Applying that analysis to the *Schmiel* facts, we concluded that, although the needs of the nondebtor wife appeared to be great, her capacity for excessive lawyering left us with the conclusion that she had "just barely produced sufficient evidence" to meet her bur-

den by a "slight margin." 94 B.R. at 381. *Compare Pollock, supra,* 90 B.R. at 759 (court refuses to declare attorneys' fees nondischargeable because the "necessary evidence" to conclude that the attorneys' fees were intimately connected with the support award was lacking even though the court suspected that it might have reached a different result on a fuller record).

In *Borzillo,* upon which FWRV relies heavily, we were faced with a Separation Agreement which failed to designate the husband-debtor's liability for $1,250 of the nondebtor-wife's attorneys' fees as either support or a property disposition. 130 B.R. at 440, 445. However, our decision in favor of the wife was driven by the great disparity between the parties' respective incomes: the debtor earned in excess of $50,000 annually (which seemed to us at that time a very comfortable income), while the wife, left with custody of the parties' teenaged son, was unemployed, as she had been throughout the parties' 25-year marriage. *Id.* at 445.

In *Bryer, supra,* we noted that the standards for a determination of whether an alleged support obligation is entitled to an administrative priority under 11 U.S.C. § 507(a)(7) were the same as the standards for § 523(a)(5) dischargeability. 216 B.R. at 762. These standards involved application of the three factors emphasized in § 523(a)(5) determinations in *In re Gianakas,* 917 F.2d 759, 762, 763 (3d Cir.1990), *i.e.,* (1) the language and substance of the parties' agreement or court decree; (2) the parties' relative financial circumstances; and (3) the function served by the obligation. We concluded in that case that the husband's claims against the debtor were not properly classifiable as support. *Id.* at 763-64.

Finally, in *Simeone,* we were faced with making an equitable distribution between a husband-debtor and a nondebtor wife. Although the wife had amply documented her $73,000 claim for counsel fees with timesheets containing detailed designations of services over a ten-year period,[2] and established that the Debtor had delayed the proceedings in state court for years by refusing to comply with court orders, we allocated only $10,000 to the wife for counsel fees. 214 B.R. at 546-47. At that time, we considered the $73,000 sum requested to be astronomical.

■ The sum of these decisions is that, in appropriate circumstances, notably when and to the extent that a nondebtor spouse meets the burden of showing need and clearly documents the relationship between the fees sought and a claim for support, we are inclined to allow a modest portion of the more needy spouse's attorneys' fees to be allocated to a debtor-spouse and to be deemed nondischargeable in the responsible spouse's bankruptcy case. To date, however, even in cases involving years of court proceedings (*Simeone*) and other cases involving efforts at locating assets allegedly hidden by one spouse in Europe (*Schmiel*), the high water mark of attorneys' fees deemed nondischargeable has been $11,500 (*Schmiel*).

### b. *FWRV's Claims Are Not Barred Because the Parties Attempted to Dismiss the N.Y. Court Action.*

■ The instant parties raise a panoply of arguments, based on federal law and state law. In his arguments, the Debtor goes so far a suggesting that his $47,000 payments be refunded on top of his receiving § 362(h) damages. FWRV, meanwhile, argues that its entire remaining bill of about $670,000 should be declared nondischargeable. Many of these arguments are ingenious and well-developed, as we might expect to emerge from a thicket of lawyers who have large sums at stake. However, not surprisingly in light of the properly-conservative bent displayed by us in *Schmiel, Borzillo,* and *Simeone,* we find none of the extreme positions palatable and, in the last analysis, they cancel out each other.

The Debtor makes an argument that, since the New York divorce action was voluntarily discontinued by the Wife and himself on December 2, 1997, neither this court nor the N.Y. Court can make a determination that he is obligated to remit any attorneys' fees to

2. This fact renders FWRV's claims that it could not be expected to fully document its services difficult to accept. *Compare* page 750 *supra* and page 762 *infra.*

FWRV because there is no longer any underlying divorce action. He argues, citing *Taylor v. Taylor*, 120 A.D.2d 355, 502 N.Y.S.2d 7 (1st Dept.1986), that, when parties discontinue a New York divorce case, no application for attorneys' fees can subsequently be allowed pursuant to section 237(a) of New York Domestic Relations Law. *See also Walsh v. Walsh*, 59 A.D.2d 701, 398 N.Y.S.2d 288 (2d Dept.1977). He also makes much of the fact that the Wife has waived her claims against Debtor for payment of her attorneys' fees in the parties' Marital Settlement Agreement and that FWRV is purportedly proceeding only in its own interests.

For its part, FWRV, citing *Sadofsky v. Sadofsky*, 78 A.D.2d 520, 521, 431 N.Y.S.2d 594, 595 (2d Dept.1980), counters that, when parties to divorce actions reconcile and seek to withdraw their divorce actions before an application for attorneys' fees can be made, such action on the part of the spouses does not divest the divorce court of its jurisdiction over the issue of the award of attorneys' fees.

■■■ Relevant New York decisional law appears to support the conclusion that, even if the parties to a divorce resolve their differences, their attorneys can still be awarded fees and costs payable by the opposing party. In particular, an award of fees will be permitted when the attorneys have a written request for attorneys' fees pending prior to the discontinuance of the action, regardless of whether court has ruled on it; when the trial court retains for itself jurisdiction to resolve legal fees issues, *Gilmore v. Gilmore*, 138 A.D.2d 347, 525 N.Y.S.2d 639, 639–40 (2d Dept.1988); when attorneys make oral motions for fees which the trial court does not decide prior to the discontinuance of a case, *Hogan v. Hogan*, 194 A.D.2d 520, 521, 598 N.Y.S.2d 310, 311 (2d Dept.1993); and when fee applications are made by attorneys immediately after a stipulation to discontinue a case is entered on the record. *Sadofsky, supra*, 78 A.D.2d at 521, 431 N.Y.S.2d at 595. It is only post-judgment fee applications for attorneys' fees earned prior to the discontinuance of a case, filed after the date that the case is discontinued, that cannot be granted. *Taylor, supra*, 120 A.D.2d at 356, 502 N.Y.S.2d at 8.

Our review of the facts of this case leads us to conclude that at least some part of the attorneys' fees sought by FWRV can be awarded by this court, for several reasons. First, FWRV filed a series of motions for *pendente lite* counsel fees. The final motion for *pendente lite* fees, in the amount of $665,-000, was filed in the N.Y. Court on August 28, 1997, although this filing was withdrawn without prejudice in an uncharacteristic recognition by FWRV that this filing violated the automatic stay. No award was therefore made on this application. However, the final review of all fee applications made in the N.Y. Court action has at all times remained pending as of the time of the discontinuance of the divorce action. Second, Justice Heitler of the N.Y. Court stated on the record at a hearing in the divorce action held on November 25, 1997, that, before she would enter the dismissal stipulation presented by the Debtor and the Wife as an order of the court, the parties would need to provide therein that there were open issues still left to be decided, including "the monetary aspects of this case, *the legal fee aspects of this case*, the maintenance aspects of this case." (emphasis added).

Furthermore, section 3217(a)(2) of the New York Civil Practice Law and Rules expressly states that parties can discontinue a case without a court order by filing a stipulation *only if* "no person not a party has an interest in the subject matter of the action." Since FWRV had already applied for additional attorneys' fees in the divorce action in its own name prior to the purported discontinuance of the N.Y. Court divorce case, it clearly was a party with an interest in the subject matter of that action. Consequently, that case could not be discontinued without a court order approving the stipulation between the Wife and the Debtor. Since FWRV has an interest in the litigation and it did not agree to discontinue the divorce action by stipulation, and since no court order was entered dismissing the case on the stipulation, the divorce action was not effectively discontinued. Thus, the N.Y. Court was not divested of its jurisdiction over the case and the case had not ended. As a result, the

purported discontinuance of this action does not in any sense bar FWRV's claims.

c. *The Lack of a Pre–Petition State Court Order Granting FWRV's Attorneys' Fees Does Not Bar Its Claim.*

The Debtor also argues that a close reading of § 523(a)(5) bars any declaration of nondischargeability which has not become the subject of a "separation agreement, divorce decree or other order of a court of record," as of the time of the Debtor's bankruptcy filing, citing *In re Smolenski,* 210 B.R. 780, 783 (Bankr.N.D.Ill.1997); and *In re Fonnemann,* 128 B.R. 214, 217–19 (Bankr. N.D.Ill.1991). This argument is more easily conceptualized when applied to the balance of fees over and above both the $47,000 already ordered and paid and the $85,000 already ordered and subject to appeal. There is indeed no order relating to the balance.

Moreover, the Debtor argues that, even with respect to the $85,000 which is the subject of a N.Y. Court order, its entry was not preceded by what the Debtor argues was the prerequisite evidentiary hearing. He further argues that the order did not sufficiently specify that it was on account of support.

We cannot agree that it would be proper for this court to, in effect, assume the rule of a New York appellate court and review the procedures leading up to the February 11, 1997, order for procedural errors in its entry and "reverse" it if such errors are found. However, we do agree that the purpose of the order is not translated into distinctions which become meaningful upon its applications to § 523(a)(5).

■ With respect to the procedural argument, there is ample New York precedent for the principle that a full-blown hearing is not required before a court awards *interim* attorneys' fees to one spouse in a divorce action. *Sadofsky, supra,* 78 A.D.2d at 521, 431 N.Y.S.2d at 595. However, in the absence of a stipulation in which one spouse agrees to pay the attorneys' fees of another spouse in a divorce action, before a court can make a *final* award of attorneys' fees to one spouse, a hearing must be held in which the

opposing spouse can be heard and is permitted to contest such an award. *Nee v. Nee,* 240 A.D.2d 478, 479, 658 N.Y.S.2d 440, 442 (2d Dept.1997); *Maroney v. Maroney,* 208 A.D.2d 915, 916, 617 N.Y.S.2d 874, 875 (2d Dept.1994); *Sadofsky, supra,* 78 A.D.2d at 521, 431 N.Y.S.2d at 596; and *Fomenko v. Fomenko,* 50 A.D.2d 712, 713, 374 N.Y.S.2d 882, 885 (4th Dept.1975). The N.Y. Court proceeding simply had not reached the "final order" stage at the time that Justice Heitler entered her order.

■ The substance of the order of February 11, 1997, is recited at pages 746–47 *supra,* and we analyze it further at pages 761–62 *infra.* At this point, we note only that Justice Heitler had no reason to consider the standards of § 523(a)(5) in entering her order and therefore did not do so. It is incumbent upon FWRV to prove that the order satisfied § 523(a)(5), and its own shortcomings, not any of Justice Heitler, are at issue. Nevertheless, the order appears to us to quite easily satisfy the prerequisite that a § 523(a)(5) liability must be based upon an "order of a court of record."

■ We also must observe that we are unimpressed with the reasoning emphasized in *Smolenski* and *Fonnemann.* These results appear calculated to unjustly reward a debtor who races through the bankruptcy courthouse door before the state domestic relations court can enter an order regarding attorneys' fees. We perceive no reason why this court could not weigh the evidence supporting the entry of an order awarding counsel fees to the nondebtor party and, if appropriate, make itself the "court of record" entering the requisite order.

We should add that, if we accepted the implicit conclusion of *Smolenski* and *Fonnemann* that the "court of record" must be the applicable state domestic relations court, and not ever the bankruptcy court, we would be inclined to grant the Motion, stay our hand in deciding the Third Proceeding, allow the N.Y. Court to enter an attorneys' fee order, and only then rule on the § 523(a)(5) issue. *Cf. In re Wilson,* 116 F.3d 87 (3d Cir.1997) (it is unfair to bind the parties to a state court determination without allowing that determination to be finalized). We do not under-

stand either party to request such an extended procedure at this point. Of course, such a procedure would frustrate our articulated desire to bring these matters—to a swift conclusion.

### d. FWRV's Claim Is Not Completely Barred Because Its Services Relate In Large Part to Custody Issues.

The Debtor also argues that FWRV's concession that the greatest portion of its services involved custody and visitation undermine its ability to prove that a significant portion of its services pertained to support. Some courts do accept the Debtor's argument that attorneys' fees awarded for services that are designated as involving custody and visitation contests are not within the scope of § 523(a)(5). See Adams v. Zentz, 963 F.2d 197 (8th Cir.1992) (bankruptcy court's factual determination that a custody dispute was not related to support is upheld); and In re Aughenbaugh, 119 B.R. 861, 864 (Bankr.M.D.Fla.1990) (custody and visitation do not constitute support). Other courts disagree and reason that custody issues are inherently support-related, such that any attorneys' fees awarded in a custody dispute are nondischargeable under § 523(a)(5). See In re Jones, 9 F.3d 878, 881–82 (10th Cir.1993) (in all but "unusual circumstances," services in custody disputes are deemed support-related); and In re Ray, 143 B.R. 937, 940–41 (D.Colo.1992) (custody issues always involve support).

Our tendency would be to avoid making an absolutist ruling on the issue, as the Aughenbaugh and Ray court proceed to do in opposite directions, and leave the issue susceptible to proof by the party challenging the dischargeability that a particular award is support-related. In the absence of such evidence, we would of course be inclined to deny nondischargeability, in line with our reasoning in Schmiel and the analysis in Pollock.

### e. FWRV's Claims Are Nevertheless Damaged by the Wife's Ultimate Abandonment of, Inter Alia, Her Support Claim.

While we are not prepared to totally accept the Debtor's arguments which would eliminate any claim of FWRV as a matter of law because its client, the Wife, is no longer pursuing custody or support, or on any other basis, it must be said that these arguments take some toll on FWRV's claims. The $85,000 fees awarded, to which FWRV has its strongest claim, was an interim allowance to abide the Wife and her counsel through an anticipated long custody battle. The anticipated long trial was, however, halted in midstream. Moreover, the Wife now has relinquished custody and is no longer seeking support. If the interim allowances were subject to an adjustment upwards in the direction of the full amount requested by FWRV if the Wife had prevailed on these issue, it appears symmetrical to finally determine, when the Wife has abandoned her position for unexplained reasons, which could well include or lack fortitude or a self-realization in the lack of merit in the initial claims as easily as simply a lack of funds, that the interim fees should be adjusted downward or perhaps eliminated entirely.

FWRV suggests that the Debtor's prevalence is simply a consequence of his having worn the Wife down with his contentious litigation strategy. However, our perception of FWRV's tactics, particularly its persistence in refusing to abide by the strictures of the automatic stay, suggests that FWRV was the equal of the Debtor and all of his counsel combined in the area of contentiousness.

The absence of the Wife seriously hurts FWRV's case, because we can only speculate as to why she decided to give up her fight. Certainly, the Debtor did not emerge from this dispute unscarred. It is counterintuitive for us to view his loss of lucrative employment as a litigation strategy. In the last analysis, the Wife's absence hurts FWRV because it is the party with the burden of proof. It would seem to have a continuing access to the Wife, and has not suggested to the contrary. She certainly had a motive to cooperate in assisting FWRV. Its success would almost certainly relieve at least some of her personal obligations to FWRV. If any inference can be drawn from her absence, it is that her testimony would not have benefitted FWRV. Therefore, FWRV's attempts, in her absence, to hypothesize her potential mo-

tives to its benefit are, to put it mildly, not very persuasive.

 f. *An Analysis of FWRV's Claims Under, Principally, New York Law Leads Us to Conclude that It Is Appropriate to Set Off the Sum Which Is Deemed Dischargeable Against the Debtor's § 362(h) Damages.*

 With this backdrop, we will now attempt to determine precisely how much of the unpaid portion of FWRV's bill of approximately $670,000 should be deemed nondischargeable. At the outset, we note that the determination of what constitutes alimony, maintenance, or support under § 523(a)(5) is to be determined under federal bankruptcy law, not state law. *See Gianakas, supra,* 917 F.2d at 762; *In re Rosen,* 151 B.R. 648, 653 (Bankr.E.D.N.Y.1993); *In re Silberfein,* 138 B.R. 778, 780 (Bankr.S.D.N.Y.1992); and *Borzillo, supra,* 130 B.R. at 443. Consequently, a "bankruptcy court is not obligated to find that a particular debt is nondischargeable solely because of how the debt is characterized under state law." *Rosen, supra,* at 653. *See also Gianakas, supra,* 917 F.2d at 762–63; *Silberfein, supra,* 138 B.R. at 780; and *Borzillo, supra,* 130 B.R. at 443–44. However, in making this determination, a bankruptcy court is often obliged to refer to state law to provide guidance on this issue. *See Brown v. Felsen,* 442 U.S. 127, 138–39, 99 S.Ct. 2205, 2212–13, 60 L.Ed.2d 767 (1979); *Gianakas, supra,* 917 F.2d at 762; *Forsdick v. Turgeon,* 812 F.2d 801, 802–03 (2d Cir. 1987); *Silberfein, supra,* 138 B.R. at 780; *Borzillo, supra,* 130 B.R. at 443; and *Schmiel, supra,* 94 B.R. at 380 n. 3.

New York law is therefore, to some degree, applicable to the substantive issues discussed herein, particularly regarding whether attorneys' fees are considered to be support under applicable state law, since the parties were New York residents when they filed for divorce and their divorce action was filed in that state. In that regard, § 237(a) of the New York Domestic Relations Law gives the courts the power to award fees to dependent spouses in divorce actions to assist them in bringing or defending such actions. *See also Silberfein, supra,* 138 B.R.

at 781 (a court is required "to determine if the award of counsel fees to the debtor's spouse was a necessary concomitant to her ability to defend or maintain her matrimonial action, and therefore an inescapable duty of the debtor to support his former spouse").

 Applying this statute, the New York courts have consistently held that the issue of whether one spouse can be forced to pay the attorneys' fees of another spouse in a divorce action is controlled by the circumstances and equities of the case, considering particularly the disparity in the financial circumstances of the parties. *Nee, supra,* 240 A.D.2d at 479, 658 N.Y.S.2d at 442; *Kalinich v. Kalinich,* 234 A.D.2d 344, 651 N.Y.S.2d 98 (2d Dept. 1996); *Kesten v. Kesten,* 234 A.D.2d 427, 650 N.Y.S.2d 807, 808 (2d Dept.1996); *Ianniello v. Ianniello,* 235 A.D.2d 607, 608, 651 N.Y.S.2d 724, 725 (3d Dept.1997), as well as the merits of each party's respective position. *See DeCabrera v. Cabrera–Rosete,* 70 N.Y.2d 879, 881, 524 N.Y.S.2d 176, 177, 518 N.E.2d 1168, 1169 (1987); *Nee, supra,* 240 A.D.2d at 479, 658 N.Y.S.2d at 442; *Lightcap v. Lightcap,* 236 A.D.2d 332, 654 N.Y.S.2d 22 (1st Dept.1997); and *Ianniello, supra,* 235 A.D.2d at 608, 651 N.Y.S.2d at 725. *Pendente lite* awards of attorneys fees such as that granted to the Wife in this case "should be an accommodation between the reasonable needs of the moving spouse and the financial ability of the other spouse, with due regard for the preparation standard of living." *Kesten, supra,* 234 A.D.2d at 427, 650 N.Y.S.2d at 808.

 In defense of its attorneys' fees request, FWRV cites to numerous New York cases in which courts have held that a significant disparity in the incomes of two spouses in a divorce action should be taken into consideration when determining whether to award attorneys fees to the spouse earning the lower income, and that the fact that the spouse with the lower income could have paid his or her own attorneys' fees through his or her income or other assets available to him or her does not preclude that spouse entirely from obtaining attorneys' fees, since that spouse is not required to be indigent nor must he or she first deplete all capital avail-

able to him or her in order to obtain an award of attorneys' fees. *See, e.g., Fisher v. Fisher*, 159 Misc.2d 1115, 608 N.Y.S.2d 383 (New York Co.Sup.Ct.1994) (court awarded $75,000 in interim attorneys' fees to wife who had $170,000 available to her, since husband had $35 million at a minimum available to him); *Maher v. Maher*, 196 A.D.2d 530, 601 N.Y.S.2d 165 (2d Dept.1993) (while wife received substantial distribution of marital property, she was still entitled to a "significant award" of attorneys' fees); *Vicinanzo v. Vicinanzo*, 193 A.D.2d 962, 598 N.Y.S.2d 362 (3d Dept.1993) (while wife received substantial distribution of marital property, she was still entitled to an award of attorneys' fees); *Cole v. Cole*, 182 A.D.2d 738, 582 N.Y.S.2d 485 (2d Dept.1992) ("indigency is not a prerequisite to an award of counsel fees and a party is not required to exhaust his or her own capital in order to qualify for an interim counsel fee award"); *Wolf v. Wolf*, 160 A.D.2d 555, 554 N.Y.S.2d 521 (1st Dept.1990) (award of attorneys fees was "necessary to provide a rough equality in the resources available to each party in the course of the contest"); *Wexler v. Wexler*, 162 A.D.2d 326, 557 N.Y.S.2d 12 (1st Dept.1990) (fact that wife had money of her own with which to pay her counsel fees is just one factor to consider; court must also consider husband's financial position as well); *Hackett v. Hackett*, 147 A.D.2d 611, 538 N.Y.S.2d 20 (2d Dept.1989) (although wife received a substantial distribution of marital property, disparity in the parties' income made it appropriate for the court to award her significant attorneys' fees). *See generally DeCabrera, supra*, 70 N.Y.2d at 881, 524 N.Y.S.2d at 177, 518 N.E.2d at 1169. Neither does the spouse seeking to have his or her attorneys' fees and costs paid by the other spouse have to have been successful in the litigation to be entitled to an award of attorneys' fees. *See Brownstein v. Brownstein*, 25 A.D.2d 205, 211, 268 N.Y.S.2d 115, 124 (1st Dept.1966); *Johnson v. Johnson*, 47 Misc.2d 805, 809, 263 N.Y.S.2d 404, 408 (Westchester Co. Sup.Ct.1965), *aff'd*, 25 A.D.2d 672, 268 N.Y.S.2d 403 (2d Dept. 1966). *But cf. In re Gionis*, 170 B.R. 675 (9th Cir. BAP 1994), *aff'd*, 92 F.3d 1192 (9th Cir.1996) ($185,000 awarded to nondebtor spouse is deemed nondischargeable in case where the parties' income disparity is arguably similar to those of the parties here; however (1) the nondebtor spouse ultimately prevailed on the custody battle; (2) the entire $185,000 was awarded by the state domestic relations court prior to the bankruptcy; (3) the parties' income disparity, unlike that of the instant parties, continued at all times; (4) the nondebtor spouse did not have any interest in property comparable to the Wife's interest in the French assets; and (5) unlike here, the debtor's counsel alone was chargeable with being unnecessarily litigious).

Similarly, as we discussed in a previous decision regarding Pennsylvania law on the payment of attorneys' fees in domestic relations matters, there is no automatic award of attorneys' fees in Pennsylvania. *Simeone, supra*, 214 B.R. at 546–47, quoting *Johnson v. Johnson*, 365 Pa.Super. 409, 415, 529 A.2d 1123, 1126 (1987), *allocator denied*, 517 Pa. 623, 538 A.2d 877 (1988) (other citations omitted). Rather, a spouse must exhibit actual need to justify an award. *Id.;* and *Schmiel, supra*, 94 B.R. at 380, citing *Hoover v. Hoover*, 288 Pa.Super. 159, 431 A.2d 337 (1981). Thus, attorneys' fees should only be awarded "to put the parties 'on par' in defending their rights or in allowing a dependent spouse to maintain or defend an action for divorce." *Simeone, supra*, 214 B.R. at 546–47. *Accord, In re Spong*, 661 F.2d 6, 9 (2d Cir.1981). Such a result is allowed so that the spouse that is the more dependent can litigate a divorce matter without being financially disadvantaged. *Simeone, supra*, 214 B.R. at 547, quoting *Gill v. Gill*, 450 Pa.Super. 611, 620, 677 A.2d 1214, 1218–19 (1996).

■ As noted at page 755 *supra*, the *Gianakas* court set forth a three-factor test to be utilized in making a determination regarding the nature of a monetary award in divorce actions, *e.g.*, scrutiny of the language and substance of the settlement agreement or court order; consideration of the parties' relative financial circumstances at the time of the award; and consideration of the function being served by the obligation to pay the monetary award at the time it was created. 917 F.2d at 762–63. *See also In re Feni-*

*more,* 142 B.R. 101, 104–05 (Bankr.D.Del. 1992); and *Borzillo, supra,* 130 B.R. at 444.

■ Moreover, courts must take into consideration, when they make a determination to award attorneys' fees to one spouse and in what amount, that one spouse may have been excessively litigious in an effort to prevent the other spouse from preparing his or her case. *See Fenimore, supra,* 142 B.R. at 103; and *Schmiel, supra,* 94 B.R. at 380. *Cf. Simeone, supra,* 214 B.R. at 547. FWRV claims that Debtor ran up his and the Wife's attorneys' fees by being overly aggressive in the divorce litigation and that therefore he should be forced to pay the admittedly-excessive fees.

At the same time, however, Freed, the Debtor's first attorney, testified that it was FWRV who drove up the attorneys' fees for both parties by inundating her with letters and motions, insisting on confirming everything in writing, refusing to cooperate in disclosing the amount and extent of the Wife's French assets when being notified of their existence before the divorce case was ever filed, causing the Debtor to have to file numerous motions, obtain letters rogatory, and hire a French investigator and attorney, all to which the Wife's attorneys charged Freed to respond. Vassallo was unable to deny Freed's contention that, in one heated exchange, he called her "a fat bitch." It is our view that the highly-charged emotional environment created during the divorce case and the mistaken belief that the pockets of the Debtor would remain perpetually deep caused both sides to become unreasonable and run up unnecessary legal fees. One indicator of such unreasonableness on the part of the Wife is related to her refusal to acknowledge her French assets, while the Debtor's unreasonableness is perhaps evidenced by the fact that he changed counsel three times in the divorce action and was forced out of his very lucrative job because he was devoting too much time to his divorce case rather than letting his attorneys handle the case for him.

Finally, FWRV, which is the complaining party with regard to the issue of the dischargeability of its attorneys fees under New York law, as well as under the Pennsylvania cases cited at pages 754–55 *supra,* "bears the burden of proof in establishing that the debts in question are not dischargeable, since the court must begin with the assumption that discharge is favored in bankruptcy." *In re Scalia,* 214 B.R. 697, 703 (Bankr.E.D.N.Y. 1997). *Accord, Silberfein, supra,* 138 B.R. at 780. *See also In re Newman,* 196 B.R. 700, 704–05 (Bankr.S.D.N.Y.1996) (attorneys' fees awarded to debtor's spouse deemed dischargeable in light of counsel's failure to allege a sufficient prima facie case in support thereof).

■ The relevant time period at which the parties' relative incomes must be compared in making a determination of whether attorneys' fees are in the nature of support for purposes of § 523(a)(5) is the time that the award of fees is made. At the time that the $85,000 in attorneys fees were awarded to FWRV on behalf of the Wife in February 1997, she was earning approximately $80,000 per year, while the Debtor was earning over $1 million per year, an obviously large disparity in income. This factor weighs in favor of a determination that at least some of the attorneys' fees that were awarded to the Wife were indeed in the nature of support or maintenance.

Finally, it appears that, when Justice Heitler awarded the $85,000 in attorneys fees to the Wife, she did so in an effort to equalize the parties' abilities to defend themselves in the divorce action. She so stated in one portion of her order. *See* pages 746–47 *supra.*

FWRV has, however, asked that we find that all of the services and disbursements that they provided for Wife in connection with the divorce action for which they allegedly continued to be owed approximately $670,000 were necessary and reasonable. We cannot do so, aside from a portion of the $85,000 already awarded by the N.Y. Court, which award is, moreover, on appeal. While we agree with FWRV that the Debtor was too aggressive in his litigation strategy, we also conclude that FWRV was equally aggressive and that its attorneys did not do all that they could have done to cooperate with the Debtor regarding, particularly, full dis-

closure of the assets owned by the Wife in France in which she maintains an ownership interest. This caused excessive litigation on both sides of the table and the running up of attorneys' fees which should have been avoided.

In its post-trial brief FWRV reiterates the testimony of Abrams, one of FWRV's own partners, in which he stated that he reviewed the invoices supporting the legal fees and disbursements that FWRV charged to the Wife and concluded that seventy-six (76%) percent of the charges were "clearly identifiable" as services dealing "primarily" with support issues, while twenty-four (24%) percent dealt with "primarily property issues." Thus, he concluded that $507,228 of the Wife's remaining unpaid legal bills of $670,339 "can fairly be characterized as related to 'support'" and that the remaining "$163,111 can fairly be characterized as discovery and research related to 'property.'"

On the other hand, the Debtor argues that FWRV has not provided this court with a sufficient foundation to award the attorneys' fees requested, since the time entries are not sufficiently descriptive for us to be able to determine how much time was spent on custody, property, support, alimony, or maintenance related matters. We agree with this contention. The type of generalized entries which abound are noted at page 750 *supra.* This court has itself reviewed the legal bills of Wife and concluded that Abrams' characterization of the services provided is not at all apparent from the source-records and hence appears unsupported by any but his purest charitable guess.

It was clearly FWRV's duty to prove the amount of nondischargeable attorneys' fees, the nature of the work done for the Wife, and how much of the work done for her was related to support-related matters. This it did not do to our satisfaction. Rather, it appears to us that a large portion of the time spent by FWRV on the Wife's representation was associated with investigating and determining the extent of her French assets, which arguably is an issue more logically classified as pertaining to the property-settlement aspect of the parties' disputes. Con-

sequently, we conclude that FWRV has not satisfied its burden of proof in this regard.

It is practically impossible to figure out exactly how much of the approximately $670,000 in fees requested is in the nature of support without more extensive proof. We, therefore, hold that FWRV's request for attorneys' fees must be significantly reduced. This is particularly true when it is considered that, when Justice Heitler granted the $85,000 interim *pendente lite* fees to FWRV, she did so thinking that the litigation between the parties would be long and contentious. *See* pages 746–47 *supra.* She was correct regarding the contentiousness of the litigation, but not about the length of the trial, since the case was, as to the parties' dispute, ended by them in December 1997.

We have already discussed, from both sides of the issue, at pages 755–56 and 758 *supra,* the consequences of the fact that the Wife, in the Marital Settlement Agreement of February 3, 1998, gave up her right to collect any of her attorneys' fees from the Debtor. The Debtor's discovery revealed that the Wife is the legal owner of property located in France which appears to be worth between $1.5 million and $4 million, although there is a question of whether she has any right to liquidate any or very many of those assets while her parents are alive because they retain life estates in the majority of these properties. As a result of these investigations, FWRV has received the benefit of considerable discovery in aid of collection of its bill from the Wife done for it by the Debtor. It appears, as a result, that the Wife has resources available to pay her own attorneys' fees from these assets. We also note that the Wife continues to earn over $80,000 per year and presently has no dependents for which she has financial obligations. FWRV may be able to obtain a lien on the French properties or execute on the Wife's assets for any judgment it obtains against her for its fees.

Since the Wife presently owns such a large amount of assets and it appears that the Debtor has little or none, and that those he has will be subject to liquidation in this bankruptcy case, the full amount of the $670,000 in attorneys' fees requested by FWRV could not, considering the parties' circumstances at this time in rendering a decision as to a

further award at this time, be considered as necessary to equalize their resources, since the Wife, at this time, appears to have a better present ability to support herself than the Debtor has of supporting himself and his two children. Additionally, both parties apparently have well-off parents on which they can rely to assist them, although the wealth of the Wife's family has been documented and is likely to be superior to that of the Debtor's family.

We therefore conclude that FWRV is entitled to a decree declaring that some measure of the $85,000 in fees awarded to the Wife in its favor against the Debtor is nondischargeable, and no more. We are uncertain what that number is or should be. We are certain that the facts in this case do not support a departure from the conservative approach we took in the more appealing *Schmiel* and *Borzillo* cases. Rather than attempting the possibly futile pursuit of fixing that figure with precision, we will simply hold that it offsets the damages and attorneys' fees for which FWRV is liable to the Debtor under 11 U.S.C. § 362(h). In the interest of convenience as well as attempting to bring these disputes to a close, our order will provide that these liabilities are determined to offset one another.[3]

3. *The Instant Disposition Renders Much of the Motion Moot, and Whatever Issues Remain Should Be Decided by This Court, Causing Us to Deny the Motion.*

The Second Count of the Motion requests us to allow the N.Y. Court to determine the balance of attorneys' fees due to FWRV and determine that these fees are nondischargeable in this case. We have decided the dis-

chargeability issue. There is no apparent need for the N.Y. Court to make a final disposition of the total fees due in light of our determination regarding dischargeability. To the extent that assets are generated in administration of this case which could result in dividends on FWRV's potentially-dischargeable claims, these issues should be resolved in the claims process in this court, applying many of the principles articulated herein. At this juncture, after we have heard and decided the issues that we have, allowing this court to complete the process appears to us to be the most economical from the perspective of preserving judicial resources.

■ The first Count of the Motion requests permission to attempt to proceed to dismiss the Debtor's appeal from the February 11, 1997, Order. This Opinion decides, in the limited context of dischargeability, many of the issues which would presumably be raised in that appeal. The other issues remaining, *i.e.*, the potential liquidation of FWRV's dischargeable claims and the status and disposition of the appeal bond, *see* page 763 n. 3 *supra*, can better be resolved as part of the claims process or in litigation specifically addressing the parties' rights to the bond in this court than allowing any aspect of the Debtor's appeal to go forward in the New York courts.

The Motion will therefore be denied in its entirety.

### D. CONCLUSION

An order setting off all of the claims of the Debtor in the First Proceeding against the portion of the Debtor's indebtedness to FWRV which is declared nondischargeable in

---

**3.** A few comments are in order. First, although wiping out the Debtor's dischargeable debts under § 523(a)(5) with FWRV's § 362(h) obligation to the Debtor will eliminate any § 507(a)(7) claims of FWRV as well, *see Bryer, supra,* 216 B.R. at 762-63, it will not wipe out all of FWRV's remaining claims against the Debtor. Since we are not liquidating with prevision the portion of FWRV's claims entitled to § 523(a)(5) status, the amount of FWRV's remaining claims is not established and may have to be ascertained at some time in the future.

It may, for instance, become significant in resolving FWRV's possible claim that the appeal bond posted by the Debtor is security for any

remaining claim. Our disposition does not address the question of the status of the Debtor's appeal bond. *See* page 763 *infra*. While the appeal bond on deposit clearly appears to be property of the Debtor's estate, *see In re Shapiro,* 124 B.R. 974, 980-82 (Bankr.E.D.Pa. 1991) and cases cited therein, it is possible that FWRV can assert a special interest in this sum. *See id.* at 982-83.

We therefore are not deceiving ourselves into believing that we have resolved every dispute between these parties in this Opinion. But we do hope that we have resolved enough of these matters that the parties can resolve those remaining among themselves.

the Third Proceeding and denying the Motion will be entered.

### *ORDER*

AND NOW, this 12th day of March, 1998, after a trial of the above-captioned proceedings and the motion of FRANKLIN, WEINRIB, RUDELL & VASSALLO, P.C. ("FWRV"), for relief from the automatic stay in the main case ("the Motion") on December 16, 1997, January 20, 1998, and January 22, 1998, and upon consideration of the parties' various post-trial submissions, it is hereby ORDERED AND DECREED as follows:

1. Judgment is entered in favor of RICHARD C. WEISBERG ("the Debtor") in Adversary No. 97–1115 ("the First Proceeding") and in part in Adversary No. 97–1132 ("the Third Proceeding").

2. It is DECLARED that all liability of FWRV and RICHARD A. ABRAMS to the Debtor in the First Proceeding under 11 U.S.C. § 362(h) is SET OFF against the portion of FWRV's claim against the Debtor which is nondischargeable under 11 U.S.C. § 523(a)(5).

3. The Motion is DENIED.